## 23911

Gary Wesley ABERNATHY and Cindy Moore Abernathy, Plaintiffs v. BABY BOY, Born January 25, 1992, Defendant. Mitchell F. CALVERT, Natural Father, Third Party Plaintiff, Respondent v. Gary W. ABERNATHY, Cindy Abernathy, and Julie Ayers, Third-Party Defendants, Appellants.

Supreme Court

(437 S.E. (2d) 25)

*Randall M. Chastain,* Columbia, and *Sally Anna King,* Charleston, *for appellants Gary W. Abernathy* and *Cindy Abernathy.*

*Susan K. Dunn,* Charleston, *for appellant, Julie Ayers.*

*Glenn F. McConnell* and *Angela Mulholland,* North Charleston, *for respondent.*

*Jason A. Kauser*, Charleston, *guardian ad Litem.*

Heard, June 9, 1993.

Decided, Aug. 9, 1993.

HARWELL, Chief Justice:

This is an action for termination of parental rights and adoption of a child conceived out of wedlock by respondent Mitchell F. Calvert (Mitchell) and appellant Julie Ayers (Julie). The trial judge determined that Mitchell possessed a right to refuse consent to the proposed adoption of the child, and granted custody of the child to Mitchell. We affirm.

## I. *FACTS*

Mitchell and Julie were on active duty in the Navy when they commenced a casual sexual relationship in April 1991. Julie went on leave in June to visit her family in Oregon. Julie discovered she was pregnant and informed Mitchell by telephone that he was the father. After his initial disbelief, Mitchell begged Julie not to consider abortion, and Julie agreed.

Mitchell met Julie at the airport upon her return from leave. He offered to support her and the child. However, Mitchell had orders for sea duty, and Julie told him they would discuss the situation upon his return. Mitchell turned over his automobile and access to his bank account to Julie, telling her in a letter that the money and car were hers to use. Mitchell also offered to send Julie to college and stay home to take care of the child if she would work part-time.

While Mitchell was at sea, Julie determined that she desired no further involvement with him. She put the car in storage and withdrew only a small amount of money from the account, allegedly to pay for the storage and a fine for a speeding ticket Mitchell had asked her to take care of for him. When Mitchell returned in September, Julie rebuffed his advances and rejected his offer of marriage. Julie informed Mitchell that she had considered the idea of putting the child up for adoption, but had discarded the notion and would keep the child. Julie thereafter avoided contact with Mitchell, refused his telephone calls, and "was kind of hiding away from him."

Sometime after Mitchell returned from sea duty, Julie met the prospective adoptive parents, the Abernathys, through her roommate. Julie and the Abernathys agreed that the Abernathys would adopt the child. Julie remained on active duty until January 25, 1992, when the baby was born. The child was placed with the Abernathys with Julie's consent on January 27, 1992, and the adoption action was commenced on January 30, 1992. Mitchell, who by this time was stationed elsewhere, learned of the birth and of the pending adoption action, and filed a cross-complaint to intervene, contest adoption, and request custody on January 31, 1992.

A trial was held in December 1992. The Abernathys, joined by Julie, contended that Mitchell's consent to the adoption was not required because he failed to comply with the literal requirements of S.C. Code Ann. § 20-7-1690(A)(5)(b) (Supp. 1992).[1] Mitchell claimed that he had made a good-faith effort to provide support for the child, but that his attempts to do so had been frustrated by Julie's conduct. The trial judge determined that Mitchell had made diligent and bona fide offers of support which had been refused by Julie. The trial judge concluded that Mitchell's consent to the adoption was required, and that the adoption failed because Mitchell refused to give his consent. Mitchell was granted custody of the child. A petition for writ of supersedeas by this Court was denied on December 17, 1992.

On appeal, the parties stipulated and agreed that if Mitchell possesses a right to refuse consent to the adoption, then the adoption will fail as a matter of law, and Mitchell will be the fit and proper person to be awarded custody of the child.

---

[1] Section 20-7-1690(A)(5)(b) provides, in relevant part:

(A) Consent or relinquishment for the purpose of adoption is required of the following persons:

(5) the father of a child born when the father was not married to the child's mother, if the child was placed with the prospective adoptive parents six months or less after the child's birth, but only if:

(b) the father paid a fair and reasonable sum, based on the father's financial ability, for the support of the child or for expenses incurred in connection with the mother's pregnancy or with the birth of the child, including, but not limited to, medical, hospital, and nursery expenses.

## II. *DISCUSSION*

Appellants first contend that an unwed father's consent to adoption is not required unless he complies with the literal requirements of § 20-7-1690(A)(5)(b), which mandates that a father provide for the support of his child before the State is compelled to seek his consent to the adoption of the child. We disagree.

The United States Supreme Court has recognized that an unwed father may possess a relationship with his child that is entitled to constitutional protection. *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed. (2d) 551 (1972). However, "parental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring." *Lehr v. Robertson*, 463 U.S. 248, 260, 103 S.Ct. 2985, 2992, 77 L.Ed. 614, 626 (1983) (quoting *Caban v. Mohammed*, 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed. (2d) 297 (1979)). Thus, an unwed father must demonstrate a full commitment to the responsibilities of parenthood by coming forward to participate in the rearing of his child before his interest in personal contact with his child acquires substantial constitutional protection. *Id.*, 463 U.S. at 261, 103 S.Ct. at 2993, 77 L.Ed. (2d) at 626. The mere existence of a biological link does not merit equivalent constitutional protection. *Id.*

When a child is first born, an unwed father possesses an "opportunity no other male possesses to develop a relationship with his offspring." *Id.* at 262, 103 S.Ct. at 2993, 77 L.Ed. (2d) at 627. However, this opportunity interest is constitutionally protected only to the extent that the biological father who claims protection wants to make the commitments and perform the responsibilities that give rise to a developed relationship, because it is only the combination of biology and custodial responsibility that the Constitution ultimately protects. E. Buchanan, *The Constitutional Rights of Unwed Fathers Before and After Lehr v. Robertson*, 45 Ohio State L.J. 313, 368 (1984) (hereinafter *Unwed Fathers*). The specific acts undertaken by the unwed father to preserve his inchoate relationship with his child, as well as the nature of the relationship he wishes to foster with the child, are of considerable importance in determining whether the unwed father has evinced a commitment to his child deserving of pro-

tection. *See id.* at 352; *cf. Lehr,* 463 U.S. at 262, 103 S.Ct. at 2994, 77 L.Ed. (2d) at 627 (appellant never had any significant custodial, personal, or financial relationship with child, and did not seek to establish a legal tie until after the child was two years old). Moreover, the opportunity interest is of limited duration as a constitutionally significant interest because of the child's need for early permanence and stability in parental relationships. *Unwed Fathers* at 365.

Against this background, we must ascertain the interaction between the requirements of section 20-7-1690(A)(5)(b) and the unusual facts before us. As always, our primary function in interpreting a statute is to ascertain the intent of the Legislature. *Spartanburg Cty. Dep't of Social Svcs. v. Little,* — S.C. —, 420 S.E. (2d) 499 (1992). A statute must receive a practical, reasonable, and fair interpretation consonant with the purpose, design , and policy of the lawmakers. *Id.* We find that by enacting § 20-7-1690(A)(5)(b), the Legislature contemplated establishing general minimum standards by which an unwed father timely may demonstrate his commitment to the child, and his desire to "grasp [the] opportunity," *Lehr,* 463 U.S. at 262, 103 S.Ct. at 2993, 77 L.Ed. (2d) at 627, to assume full responsibility for his child. However, as shown by the events leading to this appeal, an unwed father's ability to cultivate his opportunity interest in his child can be thwarted by the refusal of the mother to accept the father's expressions of interest in and commitment to the child. Accordingly, we conclude that an unwed father is entitled to constitutional protection not only when he meets the literal requirements of section 20-7-1690(A)(5)(b), but also when he undertakes sufficient prompt and good-faith efforts to assume parental responsibility and to comply with the statute. *See In re Chandini,* 166 A.D. (2d) 599, 560 N.Y.S. (2d) 886 (1990); *In re Adoption of Baby Girl S.,* 141 Misc. (2d) 905, 535 N.Y.S. (2d) 676 (N.Y. Surr. 1988); *In re Baby Girl Eason,* 257 Ga. 292, 358 S.E. (2d) 459 (1987); *In re Riggs,* 612 S.W. (2d) 461 (Tenn. Ct. App. 1980), *cert. denied,* 450 U.S. 921, 101 S.Ct. 1370, 67 L.Ed. (2d) 349 (1981). To mandate strict compliance with § 20-7-1690(A)(5)(b) would make an unwed father's right to withhold his consent to adoption dependent upon the whim of the

unwed mother. *See In re Adoption of Baby Girl S.*, 141 Misc. (2d) 905, 535 N.Y.S. (2d) 676 (N.Y. Surr. 1988).

Appellants next assert that even if literal compliance with section 20-7-1690(A)(5)(b) is not mandated, Mitchell's conduct was insufficient to require his consent to the adoption. We disagree.

It is undisputed that Mitchell attempted to provide monetary support to Julie during her pregnancy, but his offers were rejected by her. In addition, Mitchell endeavored to keep apprised of Julie's progress during the pregnancy, but she shielded herself from contact with him, even to the point of complaining to her superiors that Mitchell was harassing her by his numerous telephone calls. Mitchell appeared at the hospital after learning that the child had been born and offered to pay medical expenses related to the birth, but was told there were no expenses because he and Julie were in the Navy. Although Mitchell sought no legal advice regarding the means available for him to protect his parental interest in the child, his lack of action was engendered by Julie's assurance to him that she would not place the child for adoption. Further, Mitchell immediately manifested his willingness to assume sole custody of the child once he discovered that the adoption proceedings had commenced.

Time and circumstance may limit the protectability of an unwed father's interest in his child. The values that underlie protection require that the father take advantage of his opportunity to develop a relationship with his child early and completely. *Unwed Fathers* at 364-67, 381-82. Here, Mitchell timely demonstrated a willingness to develop a full custodial relationship with his child. Accordingly, we find that the trial judge did not err in ruling that Mitchell's consent to the adoption was required, and that the adoption failed as the result of Mitchell's withholding of his consent.

The order of the trial judge is

Affirmed.

CHANDLER, FINNEY, TOAL and MOORE, JJ., concur.