2483

The STATE, Respondent v. Jimmy Lee FOWLER, Appellant.
(470 S.E. (2d) 393)

Court of Appeals

*Assistant Appellant Defender Robert M. Pachak*, of the *South Carolina Office of Appellant Defense*, Columbia, *for appellant.*

*Attorney General Charles Molony Condon, Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley W. Elliott*, and *Senior Assistant Attorney General Norman Mark Rapoport*, Columbia; and *Solicitor George M. Ducworth*, Anderson, *for respondent.*

Heard Feb. 7, 1996.

Decided Mar. 18, 1996; Reh. Den. May 23, 1996.

CURETON, Judge:

Appellant, Jimmy Lee Fowler, appeals his conviction for unlawful neglect of a child under provisions of S.C. Code Ann. § 20-7-50 (Supp. 1995). We reverse his conviction.

The issues on appeal are (1) whether the trial court erred in refusing to grant a directed verdict when the State failed to present any evidence direct or circumstantial that Fowler had legal custody of the infant victim, and (2) whether Fowler is entitled to be resentenced because the trial judge made disparaging comments about him having "bastard babies" and the solicitor recommended Fowler not receive probation because he exercised his right to a jury trial.

## FACTS

The evidence, viewed in the light most favorably to the State, reveals the following. On Wednesday, February 16, 1994, the six-month-old victim, who is the illegitimate son of Fowler, was brought to the Anderson Area Medical Center and treated for a fracture of his left tibia and a cracked rib. He also had numerous scratches on his body and a bruise on his buttocks. The Department of Social Services (DSS) took the child into custody and Fowler and Zenobia (the victim's mother) were arrested and charged with unlawful neglect due primarily to the extent of the injuries and the fact they did

not seek medical care for two days.

A review of the events leading up to the hospitalization reveals there were no noticeable injuries to the infant prior to Monday, February 14. On the night of February 14, Zenobia left the child and his two-year-old sister with Fowler for thirty minutes to an hour while she and her sister went to get a pizza. At the time Zenobia resumed care of the child, no one noticed an injury to the child.

Tuesday morning, Zenobia brought the infant to her sister's home. The child could not move his left leg and when it was touched he cried. Zenobia informed her sister the child had fallen off the coach the previous night. The sister did not insist that the child be taken to the hospital once Zenobia claimed to have spoken with the child's doctor and was instructed to give him Tylenol, and watch to see if his leg becomes swollen or he vomits. That night, Zenobia's mother told her to take the child to the hospital, but stated they might investigate what happened. Zenobia expressed reluctance in taking the child to the hospital because she did not know what to tell hospital personnel. Fowler also claimed not to know what happened to the child.

On February 17, 1994, the day after the child was admitted to the hospital, the police and an Anderson County DSS caseworker spoke with Fowler and Zenobia. Fowler stated that while sitting on the couch with the children the infant rolled off, but he caught him before he hit the floor. Fowler later gave the child a bottle and put him to sleep before Zenobia returned. The child did not appear to him to be encountering problems at that time. The next morning, Fowler stated the child appeared cranky and showed signs of pain when his leg was touched or moved. He discussed taking the child to the hospital with Zenobia, but then advised Zenobia to "let's just watch him tonight." Fowler gave several explanations of how the child may have been injured, to include the fact that his two-year-old sister was mean and could have hurt the infant. The two year old's meanness was confirmed by others at trial.

Dr. Salley Carter, the child's pediatrician, stated that on the afternoon of Tuesday, February 16, Zenobia came into her office without the child and claimed the child had fallen off the sofa and his leg was swollen to the extent he could not use it. Carter told Zenobia to take the child to the hospital for an x-

ray. Carter testified she did not instruct Zenobia to give the child Tylenol and wait to see if he vomited before taking him to the hospital. Carter and medical personnel who treated the child at the hospital testified "the pain and discomfort from the injuries from the victim's leg and rib would have been immediate" and accompanied by a "great deal" of crying. Radiologist David Holt testified the child would have experienced "very intense" pain from the injuries and would be "very, very irritable, crying, inconsolable" from the injuries and would "probably go crazy" if any attempt was made to change his diaper or feed him.

All experts agreed the victim's injuries were inconsistent with a fall off the sofa or having been grabbed as he rolled off the sofa. The experts also agreed that waiting almost two days to get medical treatment for the child endangered his comfort and that a reasonably prudent parent would have sought medical attention earlier. Dr. Carter stated, however, the failure to obtain medical assistance for two days "probably has very little influence on his long-term health." Carter also described the injury as a "fresh break . . . no older than three days of age when we saw him in the emergency room."

At sentencing, counsel for Fowler advised the judge that Fowler was 27 years old, and served in the military in Operation Desert Storm. Fowler obtained an honorable discharge from the military and was managing a Taco Bell in Clemson. Fowler told the judge that he obtained a master's degree from Clemson University. The judge responded, "You didn't learn how to not have bastard babies?" When Fowler responded, "Sir?", the judge stated, "What did Jesse Jackson spend millions of dollars say? Make grades instead of babies. You don't prove you're a man by having illegitimate children." Fowler then told the judge he and Zenobia planned to get married. The solicitor then stated:

> Your Honor, I'd just like to say we've gone through a day and a half of trial and as you have seen, you've heard the facts in evidence. The jury found him guilty and I ask that you don't go along with the recommendation of probation.

The judge then sentenced Fowler to ten years.

*LAW*

Fowler was indicted pursuant to S.C. Code Ann. § 20-7-50 (Supp. 1995), which provides in part:

> It is unlawful for a person **who has the legal custody** of a child or helpless person, without lawful excuse, to refuse or neglect to provide the proper care and attention, as defined in Section 20-7-490, for the child or helpless person, so that the life, health, or comfort of the child or helpless person is endangered or is likely to be endangered. (Emphasis added.)

S.C. Code Ann. § 20-7-490 (1985 & Supp. 1995) provides, in part:

> (B) "Abused or neglected child" means a child whose death results from or whose physical or mental health or welfare is harmed or threatened with harm, as defined by items (C) and (D), by the acts or omissions of his parent, guardian, or other person responsible for his welfare.
>
> (C) "Harm" to a child's health or welfare can occur when the parent, guardian or other person responsible for his welfare:
>
> \* \* \* \* \* \*
>
> (3) Fails to supply the child with adequate food, clothing, shelter, education . . . , or health care though financially able to do so or offered financial or other reasonable means to do so. For the purpose of this chapter "adequate health care" includes any medical or nonmedical remedial health care permitted or authorized under state law.
>
> \* \* \* \* \* \*
>
> (E) "A person responsible for a child's welfare" includes the child's parent, guardian, foster parent, an operator, employee, or caregiver as defined by Section 20-7-2700 of a public or private residential home, institution, agency, or child day care facility or a person who has assumed the role or responsibility of a parent or guardian for the child, but who does not necessarily have **legal custody** of the child. A person whose only role is as a caregiver and whose contact is only incidental with a child . . . has not assumed the role or responsibility of a parent or guardian. (Emphasis added.)

S.C. Code Ann. § 20-7-60(A)(1) (Supp. 1995) provides:

(A) It is unlawful for a person who is legally responsible, as parent, guardian, or temporary or permanent custodian, to provide for a child, mentally incompetent or helpless person, necessary food, clothing, lodging, or medical or other treatment as recognized by Section 40-47-40, to: (1) wilfully or without lawful excuse, refuse, or neglect to provide for the child, mentally incompetent or helpless person, as defined in Section 20-7-490. . . .

Finally, S.C. Code Ann. § 20-7-100 (Supp. 1995) provides:

The mother and father are the joint natural guardians of their minor children and are equally charged with the welfare and education of their minor children. . . . Neither parent shall forcibly take a child from the guardianship of the parent **legally entitled to its custody**. . . .

The phrases in bold highlight differences among the statutes governing the care, custody and safety of children. Because § 20-7-50 regulates the conduct of legal custodians, as opposed to those legally responsible for children pursuant to § 20-7-60, the issue presented is what is meant by "legal custody" and whether Fowler fits the description of a legal custodian.

The State argues that as the biological father of the infant, Fowler is his natural custodian under the provisions of § 20-7-100, irrespective of whether the parents were married. The State then equates a natural guardian to a legal custodian. We think the analogy is flawed. Penal statutes are construed strictly against the State and in favor of the defendant. *Williams v. State*, 306 S.C. 89, 410 S.E. (2d) 563 (1991).

By contracting the language of § 20-7-50 with § 20-7-60, we are convinced the legislature intended the use of the phrase "legal custody" in § 20-7-50 to indicate something more narrow than "one who is legally responsible." The phrase indicates one who has custody by virtue of a court order or by operation of law, as opposed to one who simply has physical custody at a particular time, or who is in loco parentis. S.C. Code Ann. § 20-7-953B (1976) provides that "[u]nless the court orders otherwise, the custody of an illegitimate child is solely in

the natural mother unless the mother has relinquished her rights to the child." Section 20-7-490 one contained the "legally responsible" phrase until its amendment in 1993. In *South Carolina Dept. of Social Services v. Forrester*, 282 S.C. 512, 320 S.E. (2d) 39 (Ct. App. 1984), this court stated:

> We do not feel the legislature's use of the word "legal" is intended to make Section 20-7-490(E) applicable only to those persons who are granted legal custody of a child [by court order] or who are in loco parentis with respect to a minor. Rather, it is apparent the legislature means to include any person who has the power to control or deal with a child within his or the child's home. The phrase "legally responsible for the child's welfare within a residential setting" includes those situations where a person has either the legal power to direct a child's activities or the physical power of custody or control. (Emphasis added.)

*Id.* at 516, 320 S.E. (2d) at 42. While the court concluded the uncle in *Forrester* was legally responsible for the abused child because he was a person who had "the power to control" the child, the case does make a distinction between a person who has legal custody and one who is legally responsible. In a criminal setting the distinction is important because a conviction under § 20-7-60 requires willfulness while a conviction under § 20-7-50 does not require such a showing. *See State v. Jenkins*, 278 S.C. 219, 294 S.E. (2d) 44 (1982) (proof of simple negligence was enough to sustain a conviction of a defendant who had legal custody of a neglected child under S.C. Code Ann. § 16-3-1030 (1962) now recodified as § 20-7-50).

Several cases have made a distinction between physical and legal custody. *See Greenville County Dept. of Social Servs. v. Bowes*, 313 S.C. 188, 437 S.E. (2d) 107 (1993); *South Carolina Dept. of Social Servs. v. Smith*, 311 S.C. 426, 429 S.E. (2d) 807 (1993); *Poston v. U.S. Fidelity & Guar. Co.*, 107 Wis. (2d) 215, 320 N.W. (2d) 9 (App. 1982) (divorced father who received visitation rights did not have legal custody of son under statute establishing parent liability for damages for acts of a minor in his legal custody. Rather, the court found the mother who was given custody in the divorce proceeding had legal custody). In *Abernathy v. Baby Boy*, 313 S.C. 27, 437 S.E. (2d) 25 (1993),

our Supreme Court, in determining whether as unwed father must consent to an adoption, stated the mere existence of a biological link between a father and his child does not merit constitutional protection. The Court stated it is only when this link is coupled with custodial responsibility that the courts will protect such a father's interest. Here, except to show Fowler's biological relationship to the victim, the State has not shown Fowler has assumed a parental custodial responsibility for the child.

We therefore hold the State has not proven Fowler had legal custody of the infant victim at the time of the neglect. In so holding, we note the State could have prosecuted Fowler under § 20-7-60, had it chosen to do so. Accordingly, Fowler's conviction is reversed. Having concluded Fowler's conviction must be reversed, the remaining issue is now moot.

Reversed.

SHAW and CONNOR, JJ., concurs.