535 S.E.2d 658

**Jane and John DOE, Appellants,**

**v.**

**Travis QUEEN, John Roe (Fictitious Name), and Baby Boy Tanner, a Minor under the age of seven (7) years, Respondents.**

**No. 3221.**

Court of Appeals of South Carolina.

Heard March 8, 2000.

Decided July 17, 2000.

Rehearing Denied Sept. 30, 2000.

Desa Ballard and Rebecca G. Fulmer, both of West Columbia; and James Fletcher Thompson, of Thompson & Sinclair, of Spartanburg, for appellants.

Richard H. Rhodes, of Burts, Turner, Rhodes & Thompson; and Ruth L. Cate, both of Spartanburg, for respondents.

Guardian ad Litem: Karen M. Quimby, of Slade & Mullen Law Firm, of Spartanburg.

J. Kevin Owens, of Butler, Means, Evins & Browne, of Spartanburg, for Guardian ad Litem.

CONNOR, Judge:

Appellants, Jane and John Doe, filed this adoption action alleging consent to the adoption by Respondent birth father, Travis Queen, was not required. The family court judge concluded Queen's consent was required and denied the Does' request to terminate Queen's parental rights. Subsequently, the judge denied the Does' motion to reconsider and motion for a new trial. Finally, he ordered the parties to agree to a "work-in" schedule to move Baby Boy Tanner (Tanner) from the Does' home to Queen's home. The Does appeal. We reverse and remand.[1]

## FACTS

Queen and the birth mother lived together in Kings Mountain, North Carolina from November 1997 to February 1998. In February, the birth mother informed Queen that she was pregnant and wanted an abortion, to which Queen objected. Conflicts between the couple arose, and the couple separated in February. Over the next two months, Queen and the birth mother maintained contact and occasionally saw one another. Thereafter, Queen had little contact with the birth mother.[2]

---

1. On December 1, 1999, the Does filed a petition to supplement the record. By order filed December 28, 1999, the petition was denied, but the Does were given permission to reargue the issue at oral argument on the merits of the appeal. The Does' request to supplement the record is again denied.

2. On June 25, 1998, the birth mother and her new boyfriend signed a criminal warrant against Queen for assault with a deadly weapon (an automobile). A condition of his bond was that he have no contact with the birth mother. Queen was found not guilty of the criminal charges. A week after signing the criminal warrant against Queen, the birth mother filed for an order of protection against Queen, resulting in a consent order dated July 6, 1998, prohibiting Queen from going near the birth mother for one year. Queen testified he did not see the birth mother after the order of protection and criminal trial.

At some point, the birth mother told Queen she had already gone to Atlanta and aborted the pregnancy.[3]

Tanner was born on September 21, 1998. Because the birth mother withheld Queen's address on the Consent/Relinquishment for Adoption form, the Does' attorney was not able to notify Queen of the birth until November 1998.

When the Does' attorney informed Queen about the adoption and requested his signature, Queen responded that he needed to consult an attorney. The first indication in the record that Queen had retained counsel is a consent order signed on Queen's behalf in February of 1999, three months after being notified of Tanner's birth. Queen did not file an answer to the Does' complaint until August 9, 1999, the day of the hearing. He never asked for pendente lite relief concerning custody or visitation of Tanner. Nor did he offer to pay temporary support for Tanner.

The family court judge found Queen prepared a nursery and arranged for medical insurance. Also, despite conflicting testimony, the trial judge found Queen established a bank account for Tanner. There was no documentary evidence of a savings account. The only evidence concerning the account follows. When asked if there was money set aside for Tanner, Queen stated, "I do have money." To a similar question, Queen responded, "I would initially take Two Thousand Dollars out of my savings and put into his savings account. I would make a savings account." When asked if he had been putting away money since finding out about Tanner's birth, Queen responded affirmatively.

The family court judge concluded Queen's consent to the adoption was required pursuant to S.C.Code Ann. § 20–7–1690 (Supp.1999) and *Abernathy v. Baby Boy*, 313 S.C. 27, 437 S.E.2d 25 (1993). He then concluded Queen's parental rights should not be terminated under S.C.Code Ann. §§ 20–7–1572(3) & (4) (Supp.1999), for failure to visit and failure to

---

3. In contrast to the dissent's assertion that Queen had no knowledge of Tanner's birth, Queen had opportunities to determine whether the birth mother really aborted his child. Queen's brother and a friend worked at Circuit City with the birth mother until June 1998 when she was seven months pregnant. Also, on August 21, 1998, Queen saw the birth mother in the courtroom during his trial for assault with a deadly weapon. At that time the birth mother was eight months pregnant.

support. Citing the guardian *ad litem's* report, which stated that either the Does or Queen would be suitable to have custody of Tanner, the court found that the interests of Tanner and Queen were not in conflict.

The family court denied the Does' post-trial motions and ordered the parties to agree to a schedule transferring custody of Tanner to Queen. The family court also denied the Does' motion to stay the order transferring custody.

## STANDARD OF REVIEW

■ Adoptions are equitable proceedings, and therefore, we have jurisdiction to find facts in accordance with our own view of the preponderance of the evidence. *Adoptive Parents v. Biological Parents*, 315 S.C. 535, 446 S.E.2d 404 (1994); *Phillips v. Baker*, 284 S.C. 134, 325 S.E.2d 533 (1985). In exercising our jurisdiction, we are mindful the child is the proper focus of the review. *Morgan v. South Carolina Dep't of Soc. Servs.*, 280 S.C. 577, 313 S.E.2d 350 (Ct.App.1984).

## LAW/ANALYSIS

■ The Does argue the family court erred in finding Queen's consent to the adoption was necessary under the South Carolina Adoption Act. Queen's consent is required only if he "paid a fair and reasonable sum, based on [his] financial ability, for the support of the child or for expenses incurred in connection with the mother's pregnancy or with the birth of the child, including, but not limited to, medical, hospital, and nursing expenses." S.C.Code Ann. § 20-7-1690(A)(5)(b) (Supp.1999).

There is a complete absence of evidence that Queen either supported or attempted to support Tanner after learning of the child's existence. Likewise, the only evidence of support for the birth mother during her pregnancy was the birth mother's access to a bank account she shared with Queen. While living together, Queen and the birth mother opened a joint checking account and shared expenses. Queen continued to deposit his checks in the joint checking account until July 1998, when the birth mother closed the account. In deposition testimony submitted to the trial judge as an attachment to the

Does' motion for new trial, Queen testified the birth mother took approximately $200 from his account after she moved out.

In our view, the record does not support a finding that Queen paid a reasonable sum, based on his financial ability, for the support of Tanner or for the birth mother's expenses. There is no question Queen had the financial means to contribute to Tanner's support. He testified he held two jobs and had significant sums in his savings and checking accounts. Even if the birth mother used funds from the joint account until July, there is no evidence Queen provided any support from July until September, when Tanner was born. Moreover, it is unclear that Queen set aside money for Tanner in an account for his benefit. The arrangements for insurance and the purchase of a crib are not sufficient support to require Queen's consent under the statute.

Relying on *Abernathy v. Baby Boy*, 313 S.C. 27, 437 S.E.2d 25 (1993), the family court excused Queen's failure to support either the birth mother during her pregnancy or Tanner after Queen learned of his birth. In *Abernathy*, the biological father made numerous attempts to financially support the birth mother and child but was repeatedly rebuffed by the mother. Upon learning of the adoption action, the father immediately answered, demonstrating his willingness to assume sole custody of the child. The Supreme Court excused the father for his failure to meet the literal requirements of section 20–7–1690(A)(5)(b) because the mother thwarted the father's efforts to commit to the child. The Supreme Court held "an unwed father is entitled to constitutional protection not only when he meets the literal requirements of section 20–7–1690(A)(5)(b), but also when he undertakes sufficient prompt and good faith efforts to assume parental responsibility and to comply with the statute." *Id.* at 32, 437 S.E.2d at 29.

■ For the *Abernathy* exception to apply, the unwed father must exhibit "a full commitment to the responsibilities of parenthood." *Parag v. Baby Boy Lovin*, 333 S.C. 221, 227, 508 S.E.2d 590, 593 (Ct.App.1998). In *Abernathy*, the Supreme Court concluded, "Time and circumstances may limit the protectibility of an unwed father's interest in his child. The values that underlie protection require that the father

take advantage of his opportunity to develop a relationship with his child early and completely." *Abernathy,* 313 S.C. at 33, 437 S.E.2d at 29. An unwed father must timely demonstrate a commitment to his child and a desire to grasp the opportunity to assume full responsibility for his child. *Id.* at 32, 437 S.E.2d at 29.

Queen learned of Tanner's birth in November 1998. He made no efforts to visit the child before the adoption hearing on August 9, 1999. Further, he waited almost a year, until the day of the adoption hearing, to file an answer in opposition to the request for adoption. Most significant, however, was Queen's lack of effort to support Tanner after learning of his birth. Explaining why he chose not to send money via the Doe's attorney to help support Tanner, Queen testified, "That just wouldn't be right. It would be like me giving them money to hire an attorney."

Queen's efforts concerning Tanner do not rise to the level of commitment discussed in *Abernathy.* Therefore, we cannot excuse Queen's failure to meet the literal requirements of the statute. *See Doe v. Brown,* 331 S.C. 491, 489 S.E.2d 917 (1997) (wherein the Supreme Court found the father's conduct after learning of the pregnancy failed to rise to the level necessary to meet the *Abernathy* standard); *Ex parte Black,* 330 S.C. 431, 499 S.E.2d 229 (Ct.App.1998) (refusing to apply *Abernathy* to excuse the father's failure to support his child for five months after learning he was the child's father).

The dissent appears to agree that Queen did not meet the literal requirements of section 20–7–1690(A)(5)(b). The divergence in opinion arises from our differing views of whether Queen's failure to support Tanner since learning of his birth should be excused under *Abernathy.*

As stated before, *Abernathy* requires a parent to undertake "sufficient prompt and good faith efforts to assume parental responsibility and to comply with the statute." The focus of the *Abernathy* analysis in this case is Queen's failure to make *any* effort to comply with section 20–7–1690(A)(5)(b).

To bolster its position that Queen made sufficient and good faith efforts to comply with the statute, the dissent points out that "Queen established a nursery, set up health insurance for the child, arranged child care, and began a savings account for

the child." As characterized by the dissent, Queen's acts sound like significant steps in his effort to gain custody of Tanner. The reality of his efforts demonstrate how insignificant his actions were. Queen bought a crib, filled out some insurance paperwork, asked his grandmother to babysit Tanner, and said he would set up a savings account if given custody. These acts by Queen are mere preparations for a potential change in custody. Queen is required to either actually support Tanner pursuant to the statute or make a sufficient good faith effort to support Tanner under *Abernathy*. Although Queen's actions may have proven beneficial if and when he gained custody of Tanner, the fact remains that Queen made no effort to actually support Tanner pending the potential change in custody.

The dissent suggests the guardian ad litem and trial judge were in agreement that Queen should be given custody. However, when asked which home environment would most benefit Tanner, the guardian testified:

> I know that he is doing wonderfully now with the Does. I know that he is a happy child and is as healthy as he can possibly be. My problem with trying to pick a better home is that I don't know how Mr. Queen would take care of him; it's an unknown. And, I know he has been well taken care of right now. It is my belief—it is my sincere belief that the Queens would also be loving and supportive of this child. I don't know how to pick a better home; they are both filled with love and support. I don't know how to pick a better home, one over the other.

Clearly, the guardian did not recommend Queen over the Does. If her conclusions can be adjudged anything other than a coin-toss, the guardian's statement seems to lean toward the Does, choosing the known over the unknown.

In conclusion, although we do not condone the birth mother's actions in hiding the pregnancy and birth from Queen, we find Queen did not manifest a prompt willingness to commit to the child and his actions do not establish a vigorous attempt to assume parental responsibility. Accordingly, the order of the

family court is reversed and the case is remanded for adoption proceedings in accordance with this opinion.[4]

**REVERSED AND REMANDED.**

GOOLSBY, J., concurs and HOWARD, J., dissents in separate opinion.

HOWARD, Judge, dissenting:

I agree with the majority that an "unwed father is entitled to constitutional protection not only when he meets the literal requirements of section 20–7–1690(A)(5)(b), but also when he undertakes sufficient prompt and good faith efforts to assume parental responsibility and to comply with the statute." *Abernathy v. Baby Boy*, 313 S.C. 27, 32, 437 S.E.2d 25, 29 (1993). Nevertheless, I disagree with the majority's conclusion that Queen's efforts in making a commitment to Tanner do not rise to the level discussed in *Abernathy*. I believe *Abernathy* supports the trial judge's ruling, and mandates that we affirm.

In affirming the award of custody to an unwed father, our supreme court noted that the father may possess a relationship with his child that is entitled to constitutional protection. *Abernathy*, 313 S.C. at 31, 437 S.E.2d at 28 (citing *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)). Recognizing that parental rights "do not spring full-blown from the biological connection," the court pointed out that "an unwed father must demonstrate a full commitment to the responsibilities of parenthood by coming forward to participate in the rearing of his child before his interest in personal contact with his child acquires substantial constitutional protection." *Abernathy*, 313 S.C. at 31, 437 S.E.2d at 28 (quoting *Lehr v. Robertson*, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983)). Although the court found that with the enactment of section 20–7–1690(A)(5)(b) the Legislature intended to establish "general minimum standards by which an unwed father timely may demonstrate his commitment to the child, and his desire to 'grasp [the] opportunity,'" the court recognized that an unwed father is entitled to constitutional protection not only when he meets the literal requirements of section

---

4. Because we reverse on this issue, we need not reach the Does' remaining issues on appeal.

20–7–1690(A)(5)(b), but also when he undertakes sufficient prompt and good faith efforts to assume parental responsibility and to comply with the statute. *Id.* at 32, 437 S.E.2d at 29.

In reaching this conclusion, the court specifically stated:

However, as shown by the events leading to this appeal, an unwed father's ability to cultivate his opportunity interest in his child can be thwarted by the refusal of the mother to accept the father's expressions of interest in and commitment to the child. . . . To mandate strict compliance with section 20–7–1690(A)(5)(b) would make an unwed father's right to withhold his consent to adoption dependent upon the whim of the unwed mother.

*Id.* at 32–3, 437 S.E.2d at 29.

I believe the events leading to this appeal mandate the same result. The father in this case had *no* opportunity to cultivate a relationship with his child. During her pregnancy, the birth mother consistently told Queen that she intended to and in fact had terminated her pregnancy, despite Queen's strong objection to the abortion. Due to the birth mother's deceit during the pregnancy, Queen did not learn he was a father until the Does' attorney contacted him several months after the birth. Queen informed the Does' attorney that he did not want to give up his parental rights and would contact an attorney.

After learning of Tanner's birth, Queen established a nursery, set up health insurance for the child, arranged child care, and began a savings account for the child. The majority concludes these efforts do not rise to the level of commitment discussed in *Abernathy*. In addition, the majority determined that Queen's failure to visit or support the child after learning of his birth, together with his delay in filing an answer in opposition to the request for adoption, provide a basis for finding that Queen's consent to this adoption is not required. I respectfully disagree with these conclusions.

There are several important facts in this case which parallel the key facts in *Abernathy*. In *Abernathy*, it was "undisputed that Mitchell attempted to provide monetary support to [the birth mother] during her pregnancy, but his offers were rejected by her." *Abernathy*, 313 S.C. at 33, 437 S.E.2d at 29. In this case, Queen maintained a joint checking account, and

the birth mother withdrew and spent funds from it during her pregnancy. In *Abernathy,* the birth mother "shielded herself from contact with [Mitchell], even to the point of complaining to her superiors that Mitchell was harassing her by his numerous telephone calls." *Id.* at 33, 437 S.E.2d at 29. Here, the birth mother went to extraordinary efforts to distance herself from Queen. In addition to her direct lies, she charged Queen with a criminal violation, which he successfully defended. She sought and obtained a restraining order preventing him from contacting her. She even lied on the birth records concerning her knowledge of Queen's mailing address.

The overwhelming evidence in this case establishes that Queen did not know of the existence of his child until the Does' attorney contacted him in November 1999, seeking his release of parental rights, informing him of the impending litigation, and refusing to divulge the identity of the Does or the whereabouts of the child. In fact, the Does have never disclosed their identity or address to Queen. To all of this, Queen's response was to retain legal counsel, fight the action to terminate his parental rights, and seek custody of his child.

Queen has *never* had an opportunity to develop a relationship with his child. Even so, he immediately manifested his willingness to assume sole custody of his child when he first learned of the child's existence and the adoption proceeding was contemporaneously initiated. As in *Abernathy,* Queen did so by bringing legal action for custody.

I believe the majority has placed an unreasonable burden on Queen to take extraordinary legal measures to gain access to his child *pendente lite,* despite the fact that the adoption statutes sanction the anonymity which prevented him from doing so.[1] In addition, the majority's conclusion that Queen made no efforts to visit or support Tanner after learning of his birth ignores the clear fact that both the biological mother and the Does have consistently taken vigorous legal measures to

---

[1] S.C.Code Ann. § 20-7-1736 (Supp.1999), found in the Subarticle on Adoptions, and entitled "Use of fictitious names," reads as follows: "For purposes of this subarticle, the petitioner may employ the use of fictitious names where necessary to avoid disclosure of identities of parties or persons, so long as service of process or notice is considered sufficient by the court."

avoid any contact between Queen and his son, before and throughout the course of these proceedings.[2]

The majority also places significance on the timing of a formal response by Queen, noting that Queen waited almost a year to file an answer in opposition to the request for adoption. I believe it is improper to attach any meaning to the timing of responsive pleadings when there is no basis in the record for doing so. Queen's attorney filed and served a formal answer within two months of service of the amended complaint. There are many possible reasons for the delay, none of which have anything to do with Queen or his state of mind. Since the timing of the pleadings was not an issue in the family court, the record does not explain the reasons for any apparent delays. Consequently, any inference adverse to Queen is based on pure speculation.

It may be true that the adoptive parents present a more stable environment. This is not atypical. Adoptive parents usually have a strong desire to raise a family and tend to be loving, mature and stable people who would be committed parents. Quite naturally, the life they envision for the child provides many advantages. After all, there are no accidental adoptions. It is certainly enticing for appellate judges to exercise their judgment to provide a child with what appears to be the better home, notwithstanding the biological connection or desires of the natural parent. However, to do so is to let loose the enormous judicial power of the State to selectively choose which people will raise our children, irrespective of any biological connection. I believe this treads on the most fundamental rights of our citizens as afforded by the South Carolina Constitution and the Constitution of the United States.

There are few young, unmarried adults who are required to exercise the degree of maturity and planning necessary to raise a child. Until the birth of a child, the need for fiscal responsibility and future planning is not pressing because, until then, only they suffer the consequences of their bad

2. The Does filed and unsuccessfully argued two Petitions for a Writ of Supersedeas in this Court in an attempt to supersede the family court's order implementing a visitation procedure to gradually reunite Queen with his son.

choices. Indeed, the introduction of children into the home usually provides the impetus for planning, maturing and changing expectations. However, the maturation process is an evolutionary journey. The transformation is not instantaneous. Therefore, it is fundamentally unfair of the judicial system to make such a demand on this unwed father.

I believe the majority's decision places such unrealistic expectations on an unwed father that it undermines the most basic of civil rights, effectively replacing our existing body of law with a subjective analysis not meeting constitutional muster. Queen timely demonstrated a willingness to develop a full custodial relationship with Tanner. *See Abernathy*, 313 S.C. at 33, 437 S.E.2d at 29. The family court judge came to this conclusion after carefully considering all of the evidence, and after having viewed the demeanor of the witnesses. We were not privy to that first-hand view of the case. In a well-reasoned order, the judge united the father with the son. This difficult decision was supported by the conclusions of the guardian-ad-litem, and, I believe, is mandated by our case law. For these reasons, I would affirm.