552 S.E.2d 761

Jane and John DOE, Respondents,

v.

Travis QUEEN, John Roe (Fictitious Name), and
Baby Boy Tanner, a Minor under the age of
Seven (7) years, Defendants,

Of Whom Travis Queen is Petitioner.

No. 25363.

Supreme Court of South Carolina.

Heard June 7, 2001.
Decided Sept. 17, 2001.
Rehearing Denied Oct. 10, 2001.

Richard H. Rhodes, of Burts, Turner, Rhodes & Thompson, and Ruth L. Cate, both of Spartanburg, for petitioner.

Desa Ballard, of West Columbia, and James Fletcher Thompson, of Thompson & Sinclair, of Spartanburg, for respondents.

Karen M. Quimby, of Spartanburg, Guardian Ad Litem, and J. Kevin Owens, of Butler, Means, Evins & Browne, PA, of Spartanburg, for Guardian Ad Litem.

## ON WRIT OF CERTIORARI TO
## THE COURT OF APPEALS

WALLER, Justice:

This is an adoption case. Respondents, the Does, sought to adopt Baby Boy Tanner contending the biological father's, Travis Queen's, consent to adoption was not required; alternatively, they sought termination of Queen's parental rights. The family court held Queen's consent to adoption was necessary and denied termination. A two-judge majority of the Court of Appeals reversed, finding Queen's consent to adoption unnecessary; Judge Howard dissented. We find the evidence in this case supports the ruling of the family court. We therefore reverse the Court of Appeals' opinion and reinstate the family court's order.

## FACTS

Queen and the birth mother lived together in Kings Mountain, North Carolina from November 1997 to February 1998. In January 1998, Mother informed Queen she was pregnant and wanted an abortion; Queen objected and attempted to talk her out of it. Queen and Mother continued living together for several more weeks, but Mother left in February when the couple couldn't "get past" Mother's desire to have an abortion. Thereafter, Mother told Queen she had already gone to Atlanta and aborted the pregnancy.[1]

In June 1998, Mother and her new boyfriend signed a criminal warrant against Queen for assault with a deadly weapon.[2] A condition of Queen's bond was that he have no contact with Mother. A consent order dated July 6, 1998, prohibited Queen from going near her for one year.

Tanner was born on September 21, 1998. Because Mother withheld Queen's address on the Consent for Adoption form, Queen was not notified of the birth until November 1998. When the Does' attorney requested Queen to sign papers consenting to the adoption, Queen responded that he needed to consult an attorney. Queen obtained an attorney, but did not file responsive pleadings until the day of the hearing.[3] In the interim between being advised of Tanner's birth and the hearing in August, Queen prepared a nursery and arranged for medical insurance. Queen also testified he had a bank account in which there were savings for Tanner, and that he had been putting money away since learning of Tanner's birth.

Simultaneously, the Does obtained an order in February 1999 preventing disclosure of their identity to either Queen or his attorney. Although Queen did not make any monetary contributions to Tanner during this period of time, he testified that he had always been willing to do so, but did not know the name or whereabouts of Tanner or the adoptive parents. He also testified he would reimburse them for their expenses.

---

1. The precise date on which mother told Queen she had had an abortion is unclear from the record.

2. Queen was found not guilty of the criminal charges.

3. A supplemental order indicates Queen's attorney received an extension giving "an unlimited time to file responsive pleadings."

By order dated September 15, 1999, the family court held Queen's consent to adoption was required pursuant to S.C.Code Ann. § 20-7-1690 (Supp.1999) and *Abernathy v. Baby Boy*, 313 S.C. 27, 437 S.E.2d 25 (1993). He then concluded Queen's parental rights should not be terminated under S.C.Code Ann. §§ 20-7-1572(3) & (4) (Supp.1999), for failure to visit and failure to support, and ordered a gradual transfer of custody to Queen.[4]

The Court of Appeals majority reversed, finding Queen had failed to meet the literal requirements of S.C.Code Ann. § 20-7-1690(A)(5)(b)(Supp.1999)(requiring father to pay fair and reasonable sum for the support of the child or for expenses incurred in connection with the mother's pregnancy or with the birth of the child, including, but not limited to, medical, hospital, and nursing expenses). The Court of Appeals went on to hold that Queen's failure to support was not excusable under this Court's opinion in *Abernathy v. Baby Boy*, 313 S.C. 27, 437 S.E.2d 25 (1993). Judge Howard dissented, finding Queen had made a sufficient commitment to assume parental responsibility under *Abernathy*.

## ISSUE

Did the family court properly hold Queen made sufficient prompt and good faith efforts to assume parental responsibility?

## DISCUSSION

In *Abernathy v. Baby Boy*, 313 S.C. 27, 437 S.E.2d 25 (1993), this Court held that, in certain limited circumstances, a biological father need not comply with the literal requirements of S.C.Code Ann. § 20-7-1690(A)(5)(b)(Supp.2000), which requires a father provide for the support of his child before the State must seek his consent to the adoption of the child. We noted that "an unwed father may possess a relationship with his child that is entitled to constitutional protection." 313 S.C.

---

4. Since that time, Queen has been permitted visitation for the duration of 4 hours every other weekend. The Does unsuccessfully sought a stay of the family court's transfer of custody, and, thereafter sought, and were denied, supersedeas from the Court of Appeals on two occasions to prevent the visitation.

at 31, 437 S.E.2d at 28 (citing *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)). "However, this opportunity interest is constitutionally protected only to the extent that the biological father who claims protection wants to make the commitments and perform the responsibilities that give rise to a developed relationship, because it is only the combination of biology and custodial responsibility that the Constitution ultimately protects." *Id.*

In *Abernathy,* the biological father (Father) attempted to provide monetary support to the Mother during her pregnancy, but his offers were rejected by her.[5] In addition, Father attempted to keep apprized of Mother's progress during the pregnancy, but she shielded herself from contact with him, even to the point of complaining to her superiors that Father was harassing her. From the opinion in *Abernathy,* it appears Father had no contact with Mother from September 1991 until the baby's birth on Jan. 25, 1992. Father did not pay the childbirth expenses as they were covered by the mother's insurance. After the birth of the child, Mother consented to adoption while Father was stationed elsewhere in the Navy. Father contested the adoption, and requested custody. This Court found Father had made sufficient good faith efforts to provide support.

Pursuant to *Abernathy,* we find Queen made sufficient good faith efforts to excuse him from the literal requirements of the statute.

Initially, we find Queen should not be penalized for his actions, or lack thereof, prior to Tanner's birth. Mother left their apartment when she was approximately 8–10 weeks pregnant, telling Queen she intended to have an abortion. She thereafter lied, telling him she had, in fact, had an abortion in Atlanta. She then made every attempt to conceal from Queen the fact that she had not had an abortion, effectively isolating herself from him and, through court or-

---

5. Unlike the present case, the Mother in *Abernathy* never indicated she intended to abort the pregnancy. It appears from the transcripts in *Abernathy* that Mother there used only $190.00 of Father's money. Similarly, Queen here testified the biological mother took approximately $200.00 from their joint checking account.

ders, ensuring that Queen could have no contact with her until well after the baby's birth.[6]

As we noted in *Abernathy,* "an unwed father's ability to cultivate his opportunity interest in his child can be thwarted by the refusal of the mother to accept the father's expressions of interest in and commitment to the child. . . . To mandate strict compliance with section 20–7–1690(A)(5)(b) would make an unwed father's right to withhold his consent to adoption dependent upon the whim of the unwed mother." 313 S.C. at 32–33, 437 S.E.2d at 29. This is clearly such a case Given Mother's representations that she had obtained an abortion, coupled with her extraordinary efforts to conceal her pregnancy from Queen, we find the preponderance of the evidence amply demonstrates that Queen's failure to support during the pregnancy was through no fault of his own and, accordingly, we decline to require literal compliance with the statute.

Moreover, we find Queen's actions subsequent to learning of Tanner's birth demonstrate "sufficient prompt and good faith efforts to assume parental responsibility."

The family court found Queen had made sufficient efforts in that he had "established a nursery, arranged for health insurance and began a savings account for the child." We agree. While Queen conceded he had not paid support during the ten-month period prior to the hearing, he testified he was willing to do so, and would reimburse the adoptive parents for their expenses. Further, due to a February 1999 order preventing the disclosure of the identity of the adoptive parents, Queen was unaware of the name or identity of the Does, and/or their location. Under these circumstances, we simply cannot say that Queen's failure to support or visit Tanner defeats his constitutional interest in establishing a relationship with his son.

When approached by the Doe's attorney, at which time Queen learned of Tanner's existence, Queen declined to sign a consent to adoption, instead indicating he needed to contact

6. The Court of Appeals insinuated Queen knew, or should have known, Mother was still pregnant. There is simply no evidence to this effect. The mere fact that Queen sat across a courtroom from Mother when she was allegedly quite far along in pregnancy is patently insufficient, without more, to charge him with such knowledge.

his attorney. For reasons unknown to this Court, his attorney sought and obtained an unlimited extension in which to file responsive pleadings such that an answer to the Doe's complaint was not filed until the day of the hearing. Although Queen testified he was willing and able to support the child, and had money in savings for Tanner, his mother testified that Queen's attorney never advised him to send any money to the Does.

Given the circumstances of this case, and the fact that the Does were unwilling to reveal their identity or whereabouts, we find Queen took the only reasonably available alternative measures, to wit, establishing a nursery, putting money in a bank account, and taking steps to provide for Tanner when he received custody. In our view, under the very limited facts of this case, we find Queen demonstrated sufficient prompt and good faith efforts to assume parental responsibility pursuant to *Abernathy* such that his literal compliance with section 20–7–1690(A)(5)(b) is excused. Accordingly, we concur with the family court that the adoption was properly denied and custody of Tanner should be transferred to Queen. The Court of Appeals majority opinion is

**REVERSED.**

TOAL, C.J., MOORE and BURNETT, JJ., concur.
PLEICONES, J., dissenting in a separate opinion.

PLEICONES, J.:

Because I agree with the reasoning employed and the result reached by the Court of Appeals, I respectfully dissent. In my opinion, Queen has not met the stringent requirements necessary to excuse strict compliance with the legislative mandate articulated in S.C.Code Ann. § 20–7–1690(A)(5)(b) (Supp.2000), as outlined by this Court in *Abernathy v. Baby Boy*, 313 S.C. 27, 437 S.E.2d 25 (1993).

The majority finds the fact that Mother withdrew approximately $200 from the checking account she shared with Queen to be a significant contribution to the birth mother. However, Queen testified that *both he and Mother* deposited money into the account. Thus, it is speculative to assume the money

withdrawn from the account by the mother had not been deposited by her.

The majority further finds that Queen opened a savings account for Tanner and deposited funds therein. The record, in my opinion, is far from clear on this point. When asked if he had a savings or checking account, Queen responded that he had close to six thousand dollars in a checking account and ten thousand dollars in a savings account. When asked if he had set funds aside for Tanner, Queen responded, "I *would* initially take two thousand dollars out of my savings and put into his savings account." He then said that he had been doing so since the child's birth. However, when opposing counsel attempted to clarify Queen's response, she asked, "What was the two thousand dollars? I didn't understand that. First we talked about six thousand in one and ten thousand in another one and now two thousand is going somewhere else?" Queen responded, "*My oldest son* [7] has an account open for him that I initially put two thousand dollars in. It's gonna grow interest, and I deposit a hundred dollars a month in it."

While the biological father in *Abernathy* offered to support the child, turned over his bank account and automobile to the mother during her pregnancy, and offered to take care of the child should the mother wish to pursue her education, Queen made no effort to support Tanner after learning of his birth. He explained that he chose not to send money to the adoptive parents for Tanner's support because he did not want to give them money with which to pay their attorney. His efforts were limited to purchasing a crib, taking preliminary steps aimed at procuring health insurance for Tanner, and planning to open savings account.

I agree with the Court of Appeals' description of Queen's acts as "mere preparations for a potential change in custody," and its finding that he made "no effort to actually support Tanner pending the potential change in custody." *Doe v. Queen*, 342 S.C. 204, 211, 535 S.E.2d 658, 662 (Ct.App.2000). I cannot agree that Queen's scant efforts exhibit a full commit-

---

7. Queen has another son for whom he does provide support.

ment to the responsibilities of parenthood as required by *Abernathy,* and therefore would affirm the Court of Appeals.