567 S.E.2d 898

**David Mason ARSCOTT and Teresa Helen
Laws Arscott, Appellants,**

v.

**Edgar Ira BACON, Jr., Infant Baby Boy,
and Mary Ford, Respondents.**

**No. 3525.**

Court of Appeals of South Carolina.

Heard June 6, 2002.
Decided June 27, 2002.
Rehearing Denied Aug. 22, 2002.

James F. Thompson, of Spartanburg, for appellants.

Richard H. Rhodes, of Burts, Turner, Rhodes & Thompson, of Spartanburg, for respondents.

46

Gary L. Williams, of Laurens, Guardian ad Litem.

PER CURIAM:

The Arscotts sought to adopt Infant Baby Boy. The natural mother, Mary Ford, consented to the adoption. The Arscotts contended the natural father's consent was not statutorily required and alternatively sought to terminate his parental rights. The natural father, Edgar Ira Bacon, Jr., objected to the adoption and sought custody of the child. The family court held Bacon's consent to the adoption was necessary and there were no grounds to terminate his parental rights. We conclude Bacon's consent was not required and accordingly reverse the family court.

## FACTUAL BACKGROUND

Although the relevant facts are largely undisputed, the parties do dispute the legal significance to be accorded those facts. In May 1999, Bacon and Ford began what the family court characterized as an "uncommitted" sexual relationship. From May until November, they engaged in sexual relations several times a week, usually at Bacon's home. Each maintained a separate residence. Bacon lived at his home on the lake, and Ford lived with another man, Shawn Harrell. According to Bacon's testimony, Ford told him that Harrell was homosexual and consistently denied an intimate relationship with Harrell. Apparently, however, Bacon had suspicions regarding Ford's relationship with Harrell. During that time, Bacon and Ford exchanged token gifts but did not provide monetary support to each other.

In October 1999, Ford took a home pregnancy test during a visit to Bacon's house and informed him the test was positive. There is no indication in the record that Bacon initiated any discussion with Ford at that time about marriage or having the child. Rather, Bacon testified that approximately two weeks after the pregnancy test, Ford told him she had had an abortion. There is no testimony from Bacon that he objected. In the first week of November, Bacon ended his relationship with Ford, ostensibly because of Harrell. Bacon maintained he did not really know if Ford was initially or still pregnant because her credibility with him was "very slim." He also did

not know if she actually had an abortion because she never provided him with any paperwork concerning the abortion as she had promised.

In early November 1999, Ford and others were arrested in connection with a robbery at Bacon's home. Ford was incarcerated at the local jail until January 8, 2000. According to Bacon, he inquired at the jail about whether Ford was pregnant and was advised she had indicated to jail authorities that she was. Bacon also inquired of police authorities if Ford could be forced to take a pregnancy test at the jail but was advised she could not. When Ford was released on bond in January, she went to live at a local women's shelter. In the ensuing months, Bacon asked a number of people if Ford appeared to be pregnant. He also repeatedly drove by the women's clinic, a local health care facility, in attempts to observe Ford entering or leaving.

On May 22, 2000, Ford gave birth to a son weighing four pounds, thirteen ounces. When the child was born, Ford indicated to hospital personnel that she wanted to place him for adoption. The Arscotts, who had been trying to have a family for several years, were contacted by a family member who was on staff at the hospital and met with Ford and their attorney. Ford executed a consent to adoption, and on May 25, 2000, the Arscotts took the child home from the hospital. He has lived with them since that date and is now just over two years old.

On July 17, 2000, Ford appeared in criminal court on the burglary charge. Bacon was present and Ford told him at that time that she had given birth. She had a picture with her, but Bacon stated she would not let him see it. Even with this direct information from Ford, Bacon still did not believe that she had ever been pregnant and had given birth. On August 16, 2000, Bacon was served with this adoption action which had been filed by the Arscotts in July. According to him, this was the first time he actually believed Ford had given birth. Even so, Bacon testified he was not sure the child was his, although admittedly he was sexually involved with Ford during the relevant time period for conception. Bacon filed an answer and counterclaim opposing the adoption and seeking custody and paternity testing. Bacon alleged

"the natural mother concealed her pregnancy from [him] and service of the Complaint was the first notice of the alleged paternal relationship...." The family court ordered paternity testing which established Bacon as the biological father. At a temporary hearing on November 17, 2000, the family court ordered physical and legal custody of the child to remain with the Arscotts. At his request, Bacon was ordered to pay child support of $75 per week and was permitted to have supervised visitation with the child.

Ford did not testify at the merits hearing which was held in July 2001. The court's order states she was served with pleadings but did not respond. Apparently, she appeared at the courthouse on the day of the hearing but left before it began. Therefore, Bacon's testimony was the only direct evidence regarding his relationship with Ford.

The family court found that, up until July 17, 2000, Bacon "made a sufficient prompt good faith effort to determine whether he was a father, and that the efforts did not reasonably answer the question." In making this finding, the judge stated he "[did] not observe that [Bacon] did all that he could have done, or approached an answer in the most effective manner possible ... however, ... a good faith effort does not so demand." The court found Bacon had sufficient information to "move into action after July 17th," when Ford told him she had given birth. Specifically, the court noted Bacon could have instituted court action. However, in reaching its conclusion that Bacon's consent to the adoption was necessary, the court observed:

> Whether Bacon knew that if Ford had a child it was given up for adoption and who had the child is not known to the Court. Bacon contends it was only clear to him upon being served that Ford did have a child on May 22, 2000; that he was being charged as the father, and that the child was in the care of the [Arscotts] in Laurens County. I am unable to conclude that because Bacon did not take any known affirmative steps to answer the question of paternity and otherwise assume his parental responsibilities between July 17, 2000, and August 16, 2000, his good faith efforts failed. From a purely practical point of view, it would have taken him at least as long after July 17th to get the matter before the Court as it actually did. What he might have done had

the [Arscotts] not filed [the complaint] on July 5th will never be known. What is abundantly clear is that upon his being served and the paternity test results having been returned positive, [Bacon] has been aggressive and timely in taking the steps and pursuing relief indicative of a desire to exercise the responsibilities and opportunities on behalf of the minor child in issue.

## LAW/ANALYSIS

The primary legal issue in this appeal is whether Bacon's consent to the adoption of Infant Baby Boy was required. Resolution of this issue involves an analysis of the facts of this case in light of prior South Carolina Supreme Court precedents interpreting S.C.Code Ann. § 20–7–1690 (Supp.2001). Specifically, we must examine the facts of this case in light of *Abernathy v. Baby Boy,* 313 S.C. 27, 437 S.E.2d 25 (1993), and *Doe v. Queen,* 347 S.C. 4, 552 S.E.2d 761 (2001). In both of those cases, the supreme court found the father's consent to adoption was required. The importance of analyzing the facts of each specific case cannot be overstated. In *Abernathy,* the supreme court noted the "unusual facts before us." 313 S.C. at 32, 437 S.E.2d at 29. In *Queen,* the supreme court narrowed its holding to "the very limited facts of this case." 347 S.C. at 10, 552 S.E.2d at 764.

S.C.Code Ann. § 20–7–1690 (Supp.2001) addresses the issue of consent for a child's adoption. The consent of the unmarried mother is required under section 20–7–1690(A)(3). If the father of the child is not married to the mother at birth and the child is placed with the prospective adoptive parents six months or less after the child's birth, the father's consent is required only if:

(a) the father openly lived with the child or the child's mother for a continuous period of six months immediately preceding the placement of the child for adoption, and the father openly held himself out to be the father of the child during the six months period; or

(b) the father paid a fair and reasonable sum, based on the father's financial ability, for the support of the child or for expenses incurred in connection with the mother's pregnan-

cy or with the birth of the child, including, but not limited to, medical, hospital, and nursing expenses.

S.C.Code Ann. § 20–7–1690(A)(5)(a) & (b) (Supp.2001). In interpreting section 20–7–1690(A)(5)(b), our supreme court has held that literal compliance with the statute is not necessary in order for the father to possess a relationship with his child which is entitled to constitutional protection. *Abernathy* at 32, 437 S.E.2d at 29. Rather, an unwed father is entitled to constitutional protection not only when he meets the literal requirements of the statute "but also when he undertakes sufficient prompt and good-faith efforts to assume parental responsibility and to comply with the statute." *Id.*

In *Abernathy,* the father and mother were in the military when they began a casual sexual relationship. A few months later, mother informed father she was pregnant. He begged her not to consider an abortion and offered to support her and the child. Although he left shortly thereafter on naval sea duty, father turned over his automobile to mother and gave her access to his checking account. In correspondence to mother, he offered to send her to college and to stay home with the baby if she would work part-time. *Id.* at 29, 437 S.E.2d at 27. While father was on naval duty, mother informed him she no longer wanted to be involved with him. When he returned, mother informed him she intended to keep the child but rejected his offer of marriage. She also avoided contact with him and refused his telephone calls. When the child was born, mother gave her consent for adoption to the prospective adoptive parents. Father had been stationed elsewhere, but when he learned of the birth and pending adoption, he immediately sought to contest it. *Id.* at 29–30, 437 S.E.2d at 27. In concluding father's conduct constituted sufficient and good faith efforts to undertake parental responsibility, the supreme court stated:

It is undisputed that [father] attempted to provide monetary support to [mother] during her pregnancy, but his efforts were rejected by her. In addition, [father] endeavored to keep apprised of [mother's] progress during the pregnancy, but she shielded herself from contact with him, even to the point of complaining to her superiors that [father] was harassing her by his numerous telephone calls. [Father] appeared at the hospital after learning that the child had

been born and offered to pay medical expenses related to the birth, but was told there were no expenses because he and [mother] were in the Navy. Although [father] sought no legal advice regarding the means available for him to protect his parental interest in the child, his lack of action was engendered by [mother's] assurance to him that she would not place the child for adoption. Further, [father] immediately manifested his willingness to assume sole custody of the child once he discovered that adoption proceedings had commenced.

*Id.* at 33, 437 S.E.2d at 29.

In *Queen,* the father and mother lived together for several months during which mother informed father that she was pregnant and wanted an abortion. Father objected and the parties severed their relationship shortly thereafter due to the abortion issue. Mother later told father she had had the abortion in another state. 347 S.C. at 6, 552 S.E.2d at 762. Several months later, mother signed a criminal warrant against father for assault with a deadly weapon. A condition of father's bond was that he have no contact with mother. A consent order subsequently prohibited father from going near mother for one year. *Id.*

The child was born a few months later. Mother did not disclose father's address on the consent for adoption form. He was not notified of the birth until three months later when he was contacted by the prospective adoptive parents' attorney and asked to sign a consent for adoption. He advised the attorney he needed to consult with counsel, obtained counsel, and opposed the adoption. Between the time of his notification and the final hearing, father prepared a nursery and arranged medical insurance for the child. He testified that he had a bank account which contained savings for the child and had been putting money away since learning of the child's birth. Although the father did not make any contribution to the prospective adoptive parents for the child's support, father testified he was always willing to do so but they had obtained an order preventing disclosure of their names to either father or his counsel. He also testified he would reimburse them for their expenses. *Id.*

In concluding father had made sufficient prompt and good faith efforts to assume parental responsibility, the supreme court noted several facts: (1) mother represented she had obtained an abortion; (2) mother undertook extraordinary efforts to conceal her pregnancy from father; (3) the prospective adoptive parents prevented disclosure of their identity to father or his counsel by court order; (4) father offered to reimburse the prospective adoptive parents' expenses; and (5) father undertook steps to prepare a nursery, put money in a bank account, and arranged health insurance for the child. *Id.* at 9–10, 552 S.E.2d at 764.

We conclude the facts of this case, in contrast to the compelling facts of *Abernathy* and *Queen,* do not establish that Bacon undertook "sufficient prompt and good faith efforts to assume parental responsibility." Rather, the facts of this case bear striking similarities to *Ex Parte Black,* 330 S.C. 431, 499 S.E.2d 229 (Ct.App.1998), and *Parag v. Baby Boy Lovin,* 333 S.C. 221, 508 S.E.2d 590 (Ct.App.1998), where no constitutional right was found to attach. It is not for this court to expand the parameters set by our supreme court in interpreting section 20–7–1690 beyond the narrow facts of *Abernathy* and *Queen.* We decline to inject such an element of uncertainty into adoption proceedings beyond that intended by the legislation and those constitutional protections deemed necessary by the courts.

In *Parag,* this court held that the father's consent was not required under § 20–7–1690(A)(5)(b). Mother and father were both teenagers, and mother informed father she might be pregnant. He asked her on several occasions, asked her sister, and attempted to ascertain whether she was gaining weight and had a round shape, but mother never would confirm or deny that she was pregnant. She had the baby on vacation and consented to the adoption. Four months later, she told him about the birth. *Id.* at 223–24, 508 S.E.2d at 591. The adoptive parents filed an action for adoption and, pursuant to court order, an investigator contacted father. He initially indicated he was not interested in the child but seven days later, after talking with his father and grandmother, changed his mind and stated the child would stay with them until he was given a permanent posting in the Army and could raise the child himself. Upon being served, he asserted

paternity and requested a DNA test. Father testified he offered to "pay for anything" or take mother to the doctor, but because she refused to tell him, could not affirmatively determine she was pregnant. *Id.* at 224–25, 508 S.E.2d at 592.

In finding father failed to "demonstrate a full commitment to the responsibilities of parenthood," this court held father "failed to demonstrate sufficient prompt and good faith efforts to assume parental responsibility and comply with the statute." *Id.* at 227–28, 508 S.E.2d at 593–94. Specifically, despite father's claims he was thwarted, (1) father was aware mother might be pregnant at an early stage, (2) mother informed father of the pregnancy and birth, (3) father was aware that the child was placed for adoption and correctly assumed the area where the child was born and remained, (4) father had information allowing him to ascertain the child's exact location and cultivate a relationship. *Id.* Importantly, this court noted father's only actions, like Bacon's, were paternity testing and participation in the adoption proceeding. Unlike Bacon, father in *Parag* made no offer of financial support. Thus, there was no evidence father was thwarted in any way from demonstrating good faith efforts once he knew of the child's birth.

In *Ex Parte Black*, the mother was sexually active with two men and did not disclose Black as the father on the consent form. Black admitted he heard that mother might be pregnant but never tried to contact her. *Id.* at 432–33, 499 S.E.2d at 230. The family court relied primarily on father's lack of diligence in inquiring about the pregnancy. This court found no evidence father assumed any responsibility prior to the adoption action or attempted to help mother or the adoption agency with pregnancy or childbirth expenses. Rather, only after he was served with the adoption action did Black seek paternity testing and contest the adoption. *Id.* at 435–36, 499 S.E.2d at 231–32. Unlike Bacon, father never offered to support to the child after receiving the paternity test results five months before the hearing. However, as in *Ex Parte Black*, Bacon's response appears to be judicially motivated. *Id.* Bacon only asked his brother, an attorney, what steps he should take after he was served with the adoption action. His efforts came too late.

This is not a "thwarted birth father" case. In his answer, Bacon alleged Ford concealed the pregnancy from him and the first notice he had of the parental relationship was service of the complaint. The facts indicate otherwise. Ford told Bacon in October 1999 that she was pregnant. Although she told him she was going to have an abortion, Bacon stated he did not believe her, and she never produced the written proof which Bacon requested. Bacon asked authorities if Ford was pregnant and was advised she had completed a jail form indicating she was. Bacon continually asked people if Ford appeared pregnant. He drove past a local health care facility to see if he could observe her entering or leaving. He knew Ford was living in the community and staying at a local women's shelter. Although she could not contact him due to the conditions of her criminal bond, Bacon was not legally prohibited from contacting her or having someone else contact her. Most importantly, from July 17 to August 16, Bacon did nothing, despite knowing that Ford had a child and he could be the father.

The critical question is not whether Bacon believed Ford was pregnant but whether he was on notice of sufficient facts to pursue his legal rights and whether he was thwarted by the birth mother from doing so. Generally, courts rely on parties to be proactive in protecting their own rights. Bacon was on notice of sufficient facts to create an affirmative duty to investigate whether Ford was carrying or had delivered his child if he wished to claim constitutional protection. Under the provisions of the statute relating to unmarried fathers, paternity may frequently be in doubt. However, doubt as to paternity does not totally absolve a putative father of his responsibility to take steps to protect his rights. Most cases focus on pre-placement conduct except where there is no evidence the natural father knew of the birth. In light of the information Bacon had, and particularly given his personal distrust of Ford's credibility, his lack of initiative calls into question his concern about protecting his rights as a father. His actions fall short of the sufficient prompt and good faith efforts necessary for constitutional protection to attach. Thus, we conclude Bacon's consent to the adoption was not necessary.

Moreover, in the ultimate analysis, this court's lodestar is always the best interests of the child. *See, e.g. Patel v. Patel,* 347 S.C. 281, 285, 555 S.E.2d 386, 388 (2001) ("In a custody case, the best interest of the child is the controlling factor."); *S.C. Dep't of Soc. Servs. v. Cummings,* 345 S.C. 288, 298, 547 S.E.2d 506, 511 (Ct.App.2001) ("The best interests of the child are paramount when adjudicating a TPR case."). Our supreme court recently overruled a long line of cases holding that the termination of parental rights statute should be strictly construed and determined that it should be liberally construed consistent with the purpose of facilitating prompt adoption and the best interests of the child. *See Joiner ex rel. Rivas v. Rivas,* 342 S.C. 102, 536 S.E.2d 372 (2000). Likewise, we consider the child's best interests as a factor here. In *Abernathy,* the supreme court stated that the father's constitutional window is a limited one, balanced against the child's interest in stability. *Abernathy* at 32, 437 S.E.2d at 28. The record is clear that both the natural father and the adoptive parents would be fit parents and provide loving homes. However, the evaluating psychologist's testimony is also clear that taking the child out of the home he has known from birth until two years old would result in significant long-term trauma and possibly severe attachment issues. Thus, the best interests of Infant Baby Boy warrant reversal of the family court in this instance.

Due to its finding that Bacon's consent was required, the family court held the adoption by the Arscotts could not proceed. Given that Ford gave her consent to the adoption specifically to the Arscotts, the family court held that Ford could possibly initiate an action seeking to withdraw her consent for adoption. The court therefore declined to terminate her parental rights. No specific issue was raised by the appellants to the court's ruling regarding Ford. However, due to the role of the courts in protecting minors, this court may raise *ex mero motu* issues not raised by the parties. *See Joiner* at 107, 536 S.E.2d at 374. As in *Parag,* because Ford consented to the adoption and defaulted below, the family court erred in not terminating her parental rights. *Parag* at 229, 508 S.E.2d at 594. The record discloses no indication that Ford's consent to adoption of the child by the Arscotts was involuntary. Since we conclude Bacon's consent is not re-

quired, there is no reason to vitiate Ford's consent. Rather, it is in the best interests of the minor child to resolve this matter as expeditiously as possible. Therefore, we reverse the family court's decision not to terminate Ford's parental rights. Ford's parental rights are terminated, and the adoption may proceed without Bacon's consent.

**REVERSED.**[1]

CURETON, STILWELL and SHULER, JJ., concur.

---

1. Based on our disposition, we need not address the additional issues on appeal of termination of the natural father's parental rights and the family court's alleged improper reliance on the guardian ad litem's recommendation.