631 S.E.2d 317

**Jane & John DOE, Respondents,**

v.

**Richard ROE; Mary M.; John Roe (Whose true identity is unknown); and Baby Boy Jay, A Minor Under the Age Seven (7) Years, Defendants,**

**Of Whom Richard Roe is the Appellant.**

**No. 4119.**

Court of Appeals of South Carolina.

Heard May 9, 2006.
Decided June 5, 2006.
Rehearing Denied June 29, 2006.

352

William G. Rhoden, of Gaffney, for Appellant.

354

James Fletcher Thompson, of Spartanburg, for Respondents.

Susan A. Fretwell, of Spartanburg, Guardian Ad Litem.

ANDERSON, J.:

Richard Roe, the biological father of Baby Boy Jay, appeals (1) the family court's ruling that Roe's consent for adoption was not required under section 20–7–1690 of the South Carolina Code, and (2) the court's termination of Roe's parental rights. We affirm.

## FACTUAL/PROCEDURAL BACKGROUND

Melanie gave birth to Jay on January 19, 2005, and executed a consent for adoption form on January 20, 2005. Jane and John Doe initiated this action by filing for adoption of Jay on January 24, 2005. The Does have had custody of Jay since January 21, 2005.

Roe timely filed an answer and counter-claim seeking custody of Jay. DNA testing confirmed that Roe is Jay's biological father. The case was tried on May 9 and 11, 2005 and resulted in a ruling that Roe's consent was not required under South Carolina Code Annotated section 20–7–1690. In addition, the court terminated his parental rights.

Roe, who has been married to Martha Roe since April of 2000, separated from his wife in March of 2004 and moved in with Melanie. Within a few weeks, Roe returned to live with his wife. Shortly thereafter, Melanie discovered she was pregnant and informed Roe. On June 16, 2004, Melanie entered a drug rehabilitation center where she stayed until September 2, 2004. While she was in rehabilitation, Roe visited her and called her on the phone. The parties disagreed on the number of visits—Melanie estimated six visits, Roe recalled twelve or thirteen. By early August, the calls and visits suddenly stopped. Melanie averred:

A.  In the beginning, he called a lot, but he just quit calling and quit coming, and I didn't know what happened to him.

Q.  Before you got out, recognizing you got out September 2nd, '04, how much before the time that you got out—

how many days or weeks or months did he stop coming to visit or stop calling?

A. About a month.

Q. Had y'all had this falling out or something?

A. No. He showed up with a card and a pack of cigarettes. And, the lady there told me—he didn't even see me, it was Wednesday; it was not visit day; Thursday was visit day. And, when I came back—I think I was in class or something, but when I came back to where we lived, she gave me the card and the cigarettes.

Q. That was it?

A. I never heard from him again until December.

During the time that Roe did visit, he gave Melanie some money, brought her cigarettes, and took her out for food on several occasions.

Q. ... Was there anything that Roe ever brought you that helped you while you were in there ...?

A. He got me some food.

Q. Y'all went out to eat? ' You could check out a couple of times?

A. On Thursday, he could go eat with me, if I remember.

Q. And, I think you estimated on how many occasions during the time he came?

A. We went to Subway twice and, on a Sunday, he brought me KFC once.

Q. Subway twice; KFC once—twice; is that right?

A. Yes.

Q. And, Twenty Bucks?

A. Yes.

Q. Could it have been Thirty Bucks?

A. It could have been Thirty Bucks.

Q. Could it have been Fifty Bucks?

A. No, it wasn't.

Q. That was just one time, and it was in cash.

A. Yes—well, no, he mainly gave me Ten and Twenty on different occasions, but it was not more than Fifty Dollars altogether.

Roe confessed, "I gave her very little money while she was in there," but estimated he gave her between fifty and one hundred dollars. He averred he brought her cigarettes and soda "just about every week."

Melanie left the rehabilitation center on September 2. After staying one night with a friend, and several nights with her brother, she returned to her mother's home in Gaffney, South Carolina. On September 7, Melanie obtained phone service in her name at her mother's residence. Melanie tried unsuccessfully to reach Roe by phone on several occasions, calling Roe's mother and wife to no avail. For approximately two weeks in October, Melanie moved out from her mother's house and stayed with her brother Adam and his girlfriend Carla. She returned to her mother's in Gaffney and stayed there until December 3, 2004, when she moved back in with Adam and Carla.

Although Melanie avoided DSS, she declared she never attempted to evade Roe.

Q. Have you ever failed to answer the door for Roe?

A. Roe never knocked on the door. We knew who was at the door all the time.

Q. Did you ever hide from Roe?

A. No, I did not.

Melanie's brother, Adam, and Adam's girlfriend, Carla, confirmed that Melanie never hid from Roe, but rather attempted to contact him. Adam testified as follows at trial:

Q. At any time when you were staying with your mom and with Melanie at Kendrick Street, were you aware of any steps that were made to try to hide Melanie from Roe?

A. No, sir.

Q. Are you aware of any steps that were taken from Melanie to find Roe?

A. A few.

Q. What were you aware of that was done?

A. I was aware of her few phone calls that were made.

Q. Did you ever make any phone calls?

A. One or two.

Carla provided a similar account:

Q. Were you aware of any veil of secrecy or any kind of concerted effort that was made to hide the pregnancy from Roe?

A. No.

Q. Are you aware of any steps that were taken actually to locate Roe during this period of time?

A. Yes.

Q. What were you aware of?

A. Melanie had used the phone a couple of times trying to call. She couldn't get through. Adam had called a couple of times and couldn't get through. They just couldn't find him.

However, the evidence does suggest that Roe hid from Melanie. Adam recounted a time in December when he had a chance encounter with Roe.

Q. What happened that day?

A. Roe drove up the street. I was outside. He stopped to talk to me.

Q. What did Roe say?

A. He asked me if I knew where my sister was.

Q. What did you say to him?

A. I asked him where he was—where he had been, I'm sorry.

Q. What was his response to that?

A. He said he was trying to hide out.

Carla described an occasion when Roe stopped at the service station where Adam and Carla worked. She averred: "... I had asked at one point '[W]hat happened to you, Roe; you just disappeared?' And, he kind of looked down and said: 'That was my plan.'"

From December 3 until Jay was born Melanie stayed with her brother. Roe spoke with Melanie's brother and left a card and a pillow for her sometime in December. The card read, "21 More Day[s]," a statement apparently intended to mislead

Melanie into believing Roe was soon to be divorced from his wife.

On January 3, 2005, Roe stopped by Adam's trailer to install a car battery. Melanie was there, and Roe stayed for approximately fifteen minutes. According to Roe, "she showed me a picture of the ultrasound and I told her I didn't really have time; I just wanted to make sure she was O.K." Melanie testified:

Q. At that time, did he stay a long time? Did he talk to you about the baby and your plans together? Did y'all sit down and—what happened?

A. I was sitting on the couch; I showed him the ultrasound; he helped me with the battery in the car.

Q. Did he leave you any money?

A. No.

Q. Did he come back after that January 3rd visit again before the baby was born?

A. No, he did not.

Q. Had you left the Evans Trailer Park?

A. No, he told me that he would be back, and he never came back.

Melanie did not see Roe again until after she gave birth. On February 12, 2005, after learning of the suit for adoption by the Does, Roe purchased several items including blankets, pacifiers, and a diaper bag from Target.

The family court ruled that Roe was aware that Melanie was pregnant, knew of her location, and was informed that she was considering the option of adoption. According to the court, Roe "abdicated his responsibility to Melanie and to the unborn child." Therefore, the court found his consent to the adoption was not required and terminated his parental rights.

## STANDARD OF REVIEW

In appeals from the family court, this Court may find facts in accordance with its own view of the preponderance of the evidence. *Dearybury v. Dearybury*, 351 S.C. 278, 569 S.E.2d 367 (2002); *Lanier v. Lanier*, 364 S.C. 211, 612 S.E.2d 456 (Ct.App.2005); *Nasser–Moghaddassi v. Moghaddassi*, 364

S.C. 182, 612 S.E.2d 707 (Ct.App.2005); *Emery v. Smith,* 361 S.C. 207, 603 S.E.2d 598 (Ct.App.2004) (citing *Rutherford v. Rutherford,* 307 S.C. 199, 414 S.E.2d 157 (1992)). However, this broad scope of review does not require us to disregard the family court's findings. *Holler v. Holler,* 364 S.C. 256, 261, 612 S.E.2d 469, 472 (Ct.App.2005). *Bowers v. Bowers,* 349 S.C. 85, 561 S.E.2d 610 (Ct.App.2002); *Badeaux v. Davis,* 337 S.C. 195, 522 S.E.2d 835 (Ct.App.1999). Nor must we ignore the fact that the trial judge, who saw and heard the witnesses, was in a better position to evaluate their credibility and assign comparative weight to their testimony. *Lacke v. Lacke,* 362 S.C. 302, 608 S.E.2d 147 (Ct.App.2005); *Murdock v. Murdock,* 338 S.C. 322, 526 S.E.2d 241 (Ct.App.1999); *see also Dorchester County Dep't of Soc. Servs. v. Miller,* 324 S.C. 445, 477 S.E.2d 476 (Ct.App.1996) (noting that because the appellate court lacks the opportunity for direct observation of witnesses, it should accord great deference to the family court's findings where matters of credibility are involved).

## *LAW/ANALYSIS*

### I. An Unwed Father's Consent for Adoption

#### A. Section 20–7–1690

South Carolina Code Ann. section 20–7–1690 (Supp.2005), provides, in pertinent part:

(A) Consent or relinquishment for the purpose of adoption is required of the following persons:

. . . .

(5) the father of a child born when the father was not married to the child's mother, if the child was placed with the prospective adoptive parents six months or less after the child's birth, but only if:

(a) the father openly lived with the child or the child's mother for a continuous period of six months immediately preceding the placement of the child for adoption, and the father openly held himself out to be the father of the child during the six months period; or

**(b) the father paid a fair and reasonable sum, based on the father's financial ability, for the support of the child or for expenses incurred in connection with the**

mother's pregnancy or with the birth of the child, including, but not limited to, medical, hospital, and nursing expenses.

S.C.Code Ann. § 20–7–1690 (Supp.2005) (emphasis added). Roe did not provide a reasonable sum for the support of the child or for expenses incurred in connection with Melanie's pregnancy as outlined in the statute. However, under certain limited circumstances, our courts will excuse an unwed father for failure to meet the requirements of the statute.

## B. *Abernathy* and Its Progeny

The seminal case of *Abernathy v. Baby Boy*, 313 S.C. 27, 437 S.E.2d 25 (1993), held that even though an unwed father fails to meet the literal requirements of section 20–7–1690, he may nonetheless be afforded constitutional protection when he undertakes sufficient prompt and good faith efforts to assume parental responsibility and to comply with the statute. The biological mother and father in *Abernathy* began a "casual sexual relationship" while both were on active duty in the Navy. 313 S.C. at 29, 437 S.E.2d at 27. Soon after Julie and Mitchell discovered Julie was pregnant, Mitchell was forced to leave for sea duty. He gave Julie use of his car and access to his bank account, and offered to send her to college while he stayed home to care for the child. Julie, however, decided she did not want to be involved with Mitchell. She put the car in storage and used the bank account only to store the car and to pay a speeding ticket fine for Mitchell. Upon Mitchell's return from sea Julie "rebuffed his advances and rejected his offer of marriage. . . . Julie thereafter avoided contact with Mitchell, refused his telephone calls, and 'was kind of hiding away from him.'" *Id.* Mitchell received notice that Julie had given birth and that the Abernathys had commenced an action to adopt the child. Mitchell contested the adoption. The trial court determined he possessed the right to refuse consent to the adoption. Our supreme court affirmed.

First, the appellants maintained "an unwed father's consent to adoption is not required unless he complies with the literal requirements of section 20–7–1690(A)(5)(b), which mandates that a father provide for the support of his child before the State is compelled to seek his consent to the adoption of the

child." 313 S.C. at 31, 437 S.E.2d at 28. The court did not agree:

The United States Supreme Court has recognized that an unwed father may possess a relationship with his child that is entitled to constitutional protection. *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). However, "parental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring." *Lehr v. Robertson,* 463 U.S. 248, 260, 103 S.Ct. 2985, 2992, 77 L.Ed.2d 614, 626 (1983) (quoting *Caban v. Mohammed,* 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979)). Thus, an unwed father must demonstrate a full commitment to the responsibilities of parenthood by coming forward to participate in the rearing of his child before his interest in personal contact with his child acquires substantial constitutional protection. *Id.,* 463 U.S. at 261, 103 S.Ct. at 2993, 77 L.Ed.2d at 626. The mere existence of a biological link does not merit equivalent constitutional protection. *Id.*

When a child is first born, an unwed father possesses an "opportunity no other male possesses to develop a relationship with his offspring." *Id.* at 262, 103 S.Ct. at 2993, 77 L.Ed.2d at 627. However, this opportunity interest is constitutionally protected only to the extent that the biological father who claims protection wants to make the commitments and perform the responsibilities that give rise to a developed relationship, because it is only the combination of biology and custodial responsibility that the Constitution ultimately protects. E. Buchanan, *The Constitutional Rights of Unwed Fathers Before and After Lehr v. Robertson,* 45 Ohio State L.J. 313, 368 (1984) (hereinafter *Unwed Fathers*). The specific acts undertaken by the unwed father to preserve his inchoate relationship with his child, as well as the nature of the relationship he wishes to foster with the child, are of considerable importance in determining whether the unwed father has evinced a commitment to his child deserving of protection. *See id.* at 352; *cf. Lehr,* 463 U.S. at 262, 103 S.Ct. at 2994, 77 L.Ed.2d at 627 (appellant never had any significant custodial, personal, or financial relationship with child, and did not seek to establish a legal tie until after the child was two years old). Moreover, the opportu-

nity interest is of limited duration as a constitutionally significant interest because of the child's need for early permanence and stability in parental relationships. *Unwed Fathers* at 365.

Against this background, we must ascertain the interaction between the requirements of section 20–7–1690(A)(5)(b) and the unusual facts before us. As always, our primary function in interpreting a statute is to ascertain the intent of the Legislature. *Spartanburg Cty. Dep't of Social Svcs. v. Little,* 309 S.C. 122, 420 S.E.2d 499 (1992). A statute must receive a practical, reasonable, and fair interpretation consonant with the purpose, design, and policy of the lawmakers. *Id.* We find that by enacting section 20–7–1690(A)(5)(b), the Legislature contemplated establishing general minimum standards by which an unwed father timely may demonstrate his commitment to the child, and his desire to "grasp [the] opportunity," *Lehr,* 463 U.S. at 262, 103 S.Ct. at 2993, 77 L.Ed.2d at 627, to assume full responsibility for his child. However, as shown by the events leading to this appeal, an unwed father's ability to cultivate his opportunity interest in his child can be thwarted by the refusal of the mother to accept the father's expressions of interest in and commitment to the child. Accordingly, we conclude that an unwed father is entitled to constitutional protection not only when he meets the literal requirements of section 20–7–1690(A)(5)(b), but also when he undertakes sufficient prompt and good faith efforts to assume parental responsibility and to comply with the statute. *See In re Chandini,* 166 A.D.2d 599, 560 N.Y.S.2d 886 (1990); *In re Adoption of Baby Girl S.,* 141 Misc.2d 905, 535 N.Y.S.2d 676 (N.Y.Surr.1988); *In re Baby Girl Eason,* 257 Ga. 292, 358 S.E.2d 459 (1987); *In re Riggs,* 612 S.W.2d 461 (Tenn.Ct. App.1980), *cert. denied,* 450 U.S. 921, 101 S.Ct. 1370, 67 L.Ed.2d 349 (1981). To mandate strict compliance with section 20–7–1690(A)(5)(b) would make an unwed father's right to withhold his consent to adoption dependent upon the whim of the unwed mother. *See In re Adoption of Baby Girl S.,* 141 Misc.2d 905, 535 N.Y.S.2d 676 (N.Y.Surr.1988). 313 S.C. at 31–33, 437 S.E.2d at 28–29.

The court concluded Mitchell's efforts were sufficient to require his consent to the adoption.

It is undisputed that Mitchell attempted to provide monetary support to Julie during her pregnancy, but his offers were rejected by her. In addition, Mitchell endeavored to keep apprised of Julie's progress during the pregnancy, but she shielded herself from contact with him, even to the point of complaining to her superiors that Mitchell was harassing her by his numerous telephone calls. Mitchell appeared at the hospital after learning that the child had been born and offered to pay medical expenses related to the birth, but was told there were no expenses because he and Julie were in the Navy. Although Mitchell sought no legal advice regarding the means available for him to protect his parental interest in the child, his lack of action was engendered by Julie's assurance to him that she would not place the child for adoption. Further, Mitchell immediately manifested his willingness to assume sole custody of the child once he discovered that adoption proceedings had commenced.

Time and circumstances may limit the protectibility of an unwed father's interest in his child. The values that underlie protection require that the father take advantage of his opportunity to develop a relationship with his child early and completely. *Unwed Fathers* at 364–67, 381–82. Here, Mitchell timely demonstrated a willingness to develop a full custodial relationship with his child. Accordingly, we find that the trial judge did not err in ruling that Mitchell's consent to the adoption was required, and that the adoption failed as the result of Mitchell's withholding of his consent.

313 S.C. at 33, 437 S.E.2d at 29.

In *Ex parte Black*, 330 S.C. 431, 499 S.E.2d 229 (Ct.App. 1998), Contius Black and Martha Jane Dubose were both high school students when they began a sexual relationship. Black transferred to a nearby school and the two eventually ended their relationship. Dubose discovered she was pregnant and attempted to contact Black. She called his parents' house and was told that he no longer lived there, although this information was apparently false. Dubose gave birth on June 20, 1995, and gave the child over for adoption two days later.

Black learned that Dubose might be pregnant in October or November of 1995. In December 1995 he had a "chance meeting" with Dubose and learned she had delivered the child,

given her up for adoption, and that he was the biological father. Black and his new wife contacted the adoption agency and Black was eventually added as a party to the adoption action. The family court determined "Black's consent for the adoption of the child was not necessary because of his 'failure to timely demonstrate a willingness to develop a custodial relationship with this child.'" 330 S.C. at 433–34, 499 S.E.2d at 231. We affirmed:

We find no merit to Black's argument that the family court erred in finding he failed to timely demonstrate a willingness to develop a full custodial relationship with his daughter.

If the biological father of a child was not married to the child's mother at the time the child was born and the child was placed with prospective adoptive parents six months or less after the child's birth, the father's consent or relinquishment for the purpose of adoption is necessary if the father paid a fair and reasonable sum, based on his financial ability, toward either the child's support or expenses incurred in connection with the mother's pregnancy or with the birth of the child. S.C.Code Ann. § 20–7–1690(A)(5)(b) (Supp.1997). An unwed father, however, is entitled to a relationship with his child not only when he meets the literal requirements of this section, "but also when he undertakes sufficient *prompt* and good-faith efforts to assume parental responsibility *and to comply with the statute." Abernathy v. Baby Boy,* 313 S.C. 27, 32, 437 S.E.2d 25, 29 (1993) (emphasis added).

Because section 20–7–1690(A)(5)(b) explicitly conditions the necessity of a father's acquiescence in an adoption on his payment of support or financial assistance to the birth mother, any steps Black may have taken to assert his parental rights are insufficient to protect his relationship with his child unless accompanied by a prompt, good-faith effort to assume responsibility for either a financial contribution to the child's welfare or assistance in paying for the birth mother's pregnancy or childbirth expenses. Here, the record contains no evidence that Black attempted at any time to help Dubose or Bethany Christian Services with pregnancy or childbirth expenses. Moreover, even assuming Black is correct that he took prompt measures to

determine paternity and assert his parental rights after Dubose told him about the child, he admitted he never offered to support the child, even after receiving the results of the paternity test, which were available about five months before the final hearing. Although the family court relied primarily on Black's lack of diligence in making inquiries about Dubose's pregnancy, the record evidence of his failure to offer support for the child as of the date of the final hearing warrants our affirmance of the family court order. *See* Rule 220(c), SCACR ("The appellate court may affirm any ruling, order, or judgment upon any ground(s) appearing in the Record on Appeal.").

*Black*, 330 S.C. at 434–35, 499 S.E.2d at 231–32 (footnote omitted).

Teenagers Christine Lovin and Samuel Dunlap were involved in a sexual relationship in *Parag v. Baby Boy Lovin*, 333 S.C. 221, 508 S.E.2d 590 (Ct.App.1998). Dunlap bought her a pregnancy test when she informed him she might be pregnant, but Lovin did not give him the results. The two terminated their relationship in December 1994 or January 1995. Dunlap continued to inquire whether Lovin was pregnant, but Lovin would neither admit nor deny the pregnancy. She gave birth on July 8, 1995, and gave the baby up for adoption. Lovin did not tell Dunlap about the birth until October 1995. The Parags, in connection with their action to adopt Baby Boy Lovin, hired investigator Oehler to locate the child's father. Oehler contacted Dunlap in January of 1996. Initially, Dunlap indicated "he was planning to attend college on a football scholarship and the birth of the child interfered with his life. He stated he was not interested in having the child, but was interested in releasing the child for adoption[.]" 333 S.C. at 224, 508 S.E.2d at 592. A few days later, he changed his mind; "after talking with his grandmother and father, he thought he wanted to have the child for them to rear." *Id.*

The Parags commenced an action seeking adoption and the termination of Dunlap's parental rights. The family court concluded Dunlap had shown sufficient good faith efforts to assume parental responsibility and was entitled to protection under section 20-7-1690 and *Abernathy*. Adoption was ac-

cordingly denied. We disagreed and reversed, noting both the pre- and post-birth shortfalls of Dunlap.

It is incumbent ... upon the unwed father to demonstrate a full commitment to the responsibilities of parenthood by coming forward to participate in the rearing of the child before he may acquire substantial constitutional protection, and the mere existence of a biological link does not merit equivalent constitutional protection. While the unwed father possesses an opportunity to develop a relationship with his offspring, this opportunity is of limited duration as a constitutionally significant interest because of the child's need for early permanence and stability in parental relationships. As stated by the court in *Abernathy*, "Time and circumstances may limit the protectibility of an unwed father's interest in his child. The values that underlie protection require that the father take advantage of his opportunity to develop a relationship with his child *early and completely*." 313 S.C. at 33, 437 S.E.2d at 29 (emphasis added). Thus, the unwed father must timely "demonstrate his commitment to the child, and his desire to grasp the opportunity." 313 S.C. at 32, 437 S.E.2d at 29.

Turning to the facts at hand, we find Dunlap has failed to demonstrate sufficient prompt and good faith efforts to assume parental responsibility and comply with the statute. Dunlap was aware that Lovin might be pregnant in November of 1994. While Dunlap claims he was thwarted in his efforts to assist Lovin with the pregnancy by her avoidance of him, the record clearly shows that in October 1995, Lovin informed Dunlap of the pregnancy and the birth of his child. He was further aware at that time that the child was placed for adoption and he correctly assumed the child was in the area where Lovin had given birth. From October of 1995, Dunlap had information with which he could have sought the exact location of his child and made efforts to cultivate a relationship with the child and assume parental responsibility. However, he failed to take any action until he was contacted by the adoption investigator, three months later. Even then, the record evinces the extent of his efforts to be only submission to paternity testing and participation in the adoption action. There is absolutely no evidence that Dunlap was thwarted in any way from demonstrating his com-

mitment to the child once he learned of the child's birth. It is uncontested Dunlap never offered any financial support or assistance to Lovin in connection with the expenses of the pregnancy and birth after learning of the child's birth. Further, the record shows Dunlap never offered any financial support for the child after learning of the child's birth. *See Ex parte Black,* 330 S.C. 431, 499 S.E.2d 229 (Ct.App. 1998) (assuming unwed father took prompt measures to determine paternity and assert parental rights after biological mother informed father of child's existence, where father failed to offer to support child or assist in medical expenses, his consent to adoption was not required under § 20–7–1690(A)(5)(b)). We therefore conclude Dunlap has failed to timely demonstrate his commitment to the child and has failed to show sufficient efforts to assume parental responsibility and comply with the statute as required under *Abernathy.* Accordingly, Dunlap's consent was not required under § 20–7–1690(A)(5)(b), and the order below denying the adoption on this basis is reversed.

*Parag,* 333 S.C. at 227–29, 508 S.E.2d at 593–94 (footnote omitted).

In *Doe v. Brown,* 331 S.C. 491, 489 S.E.2d 917 (1997), Baby Girl Ashlie was conceived as the result of Brown's statutory rape of the twelve-year-old mother. The mother relinquished her parental rights and consented to adoption. Brown, joined by his parents, intervened and opposed the adoption. The family court terminated Brown's parental rights, and that ruling was affirmed by the supreme court.

In sharp contrast to *Abernathy,* the family court judge in this case found Father "young, immature, and irresponsible." He found Father failed to meet the statutory requirements, and that his conduct upon learning of the pregnancy and during the next several months did not rise to the level necessary to meet the *Abernathy* standard. Although this Court is free to find the facts differently from the family court, we find the record overwhelmingly supports these findings. *Epperly v. Epperly,* 312 S.C. 411, 440 S.E.2d 884 . (1994).

*Brown,* 331 S.C. at 497–98, 489 S.E.2d at 921.

The supreme court, in *Doe v. Queen,* 347 S.C. 4, 552 S.E.2d 761 (2001), held that the unwed father's efforts to assume

parental responsibility were sufficient to require his consent to adoption. The biological mother informed Queen that she was pregnant and wanted an abortion. Queen attempted to convince the mother to keep the child. The two ended their relationship, and the mother informed Queen she had aborted the child. The mother and her new boyfriend signed a criminal warrant against Queen for assault with a deadly weapon, and as a condition of his bond, Queen was ordered to have no contact with the mother for one year. The child was born on September 21, 1998. When Queen was notified of the birth in November 1998 he obtained an attorney. He began saving money, prepared a nursery, and arranged for medical insurance for the child. The family court ordered that Queen's consent to adoption was required under section 20–7–1690 and *Abernathy*. The supreme court agreed with the family court:

> Initially, we find Queen should not be penalized for his actions, or lack thereof, prior to Tanner's birth. Mother left their apartment when she was approximately 8–10 weeks pregnant, telling Queen she intended to have an abortion. She thereafter lied, telling him she had, in fact, had an abortion in Atlanta. She then made every attempt to conceal from Queen the fact that she had not had an abortion, effectively isolating herself from him and, through court orders, ensuring that Queen could have no contact with her until well after the baby's birth.

> As we noted in *Abernathy*, "an unwed father's ability to cultivate his opportunity interest in his child can be thwarted by the refusal of the mother to accept the father's expressions of interest in and commitment to the child.... To mandate strict compliance with section 20–7–1690(A)(5)(b) would make an unwed father's right to withhold his consent to adoption dependent upon the whim of the unwed mother." 313 S.C. at 32–33, 437 S.E.2d at 29. This is clearly such a case. Given Mother's representations that she had obtained an abortion, coupled with her extraordinary efforts to conceal her pregnancy from Queen, we find the preponderance of the evidence amply demonstrates that Queen's failure to support during the pregnancy was through no fault of his own and, accordingly, we decline to require literal compliance with the statute.

Moreover, we find Queen's actions subsequent to learning of Tanner's birth demonstrate "sufficient prompt and good faith efforts to assume parental responsibility."

The family court found Queen had made sufficient efforts in that he had "established a nursery, arranged for health insurance and began a savings account for the child." We agree. While Queen conceded he had not paid support during the ten-month period prior to the hearing, he testified he was willing to do so, and would reimburse the adoptive parents for their expenses. Further, due to a February 1999 order preventing the disclosure of the identity of the adoptive parents, Queen was unaware of the name or identity of the Does, and/or their location. Under these circumstances, we simply cannot say that Queen's failure to support or visit Tanner defeats his constitutional interest in establishing a relationship with his son. When approached by the Doe's attorney, at which time Queen learned of Tanner's existence, Queen declined to sign a consent to adoption, instead indicating he needed to contact his attorney. For reasons unknown to this Court, his attorney sought and obtained an unlimited extension in which to file responsive pleadings such that an answer to the Doe's complaint was not filed until the day of the hearing. Although Queen testified he was willing and able to support the child, and had money in savings for Tanner, his mother testified that Queen's attorney never advised him to send any money to the Does. Given the circumstances of this case, and the fact that the Does were unwilling to reveal their identity or whereabouts, we find Queen took the only reasonably available alternative measures, to wit, establishing a nursery, putting money in a bank account, and taking steps to provide for Tanner when he received custody. In our view, under the very limited facts of this case, we find Queen demonstrated sufficient prompt and good faith efforts to assume parental responsibility pursuant to *Abernathy* such that his literal compliance with section 20–7–1690(A)(5)(b) is excused. Accordingly, we concur with the family court that the adoption was properly denied and custody of Tanner should be transferred to Queen.

*Queen,* 347 S.C. at 8–10, 552 S.E.2d at 763–64 (footnote omitted).

*Arscott v. Bacon,* 351 S.C. 44, 567 S.E.2d 898 (Ct.App.2002), is our most recent decision regarding consent for adoption by an unwed father. Edgar Bacon and Mary Ford began a sexual relationship in May 1999. Ford discovered she was pregnant in October 1999. Approximately two weeks later, she told Bacon she had had an abortion. In November, Bacon ended the relationship. Mary Ford was arrested for robbing Bacon's home and was incarcerated. Unconvinced that she had been pregnant or had gone through with an abortion, Bacon inquired at the local jail whether Ford was pregnant, and jail authorities indicated that she claimed to be pregnant. Upon her release, Ford stayed at a women's shelter. Bacon drove by the shelter many times in an effort to ' catch a glimpse of her. Ford delivered the child in May 2000 and gave it up for adoption. On July 17, 2000, Ford appeared in criminal court on the burglary charge and informed Bacon that she had given birth, although Bacon still was not convinced she had ever been pregnant. Finally, Bacon was served with notice of the adoption action in August. He opposed the adoption, claiming Ford had concealed the pregnancy.

After analyzing *Abernathy, Queen, Parag,* and *Black,* we concluded Bacon had not satisfied the requirements of the statute and precedent.

This is not a "thwarted birth father" case. In his answer, Bacon alleged Ford concealed the pregnancy from him and the first notice he had of the parental relationship was service of the complaint. The facts indicate otherwise. Ford told Bacon in October 1999 that she was pregnant. Although she told him she was going to have an abortion, Bacon stated he did not believe her, and she never produced the written proof which Bacon requested. Bacon asked authorities if Ford was pregnant and was advised she had completed a jail form indicating she was. Bacon continually asked people if Ford appeared pregnant. He drove past a local health care facility to see if he could observe her entering or leaving. He knew Ford was living in the community and staying at a local women's shelter. Although she could not contact him due to the conditions of her criminal bond, Bacon was not legally prohibited from contacting her or having someone else contact her. Most

importantly, from July 17 to August 16, Bacon did nothing, despite knowing that Ford had a child and he could be the father.

The critical question is not whether Bacon believed Ford was pregnant but whether he was on notice of sufficient facts to pursue his legal rights and whether he was thwarted by the birth mother from doing so. Generally, courts rely on parties to be proactive in protecting their own rights. Bacon was on notice of sufficient facts to create an affirmative duty to investigate whether Ford was carrying or had delivered his child if he wished to claim constitutional protection. Under the provisions of the statute relating to unmarried fathers, paternity may frequently be in doubt. However, doubt as to paternity does not totally absolve a putative father of his responsibility to take steps to protect his rights. Most cases focus on pre-placement conduct except where there is no evidence the natural father knew of the birth. In light of the information Bacon had, and particularly given his personal distrust of Ford's credibility, his lack of initiative calls into question his concern about protecting his rights as a father. His actions fall short of the sufficient prompt and good faith efforts necessary for constitutional protection to attach. Thus, we conclude Bacon's consent to the adoption was not necessary.

Moreover, in the ultimate analysis, this court's lodestar is always the best interests of the child. *See, e.g. Patel v. Patel,* 347 S.C. 281, 285, 555 S.E.2d 386, 388 (2001) ("In a custody case, the best interest of the child is the controlling factor."); *S.C. Dep't of Soc. Servs. v. Cummings,* 345 S.C. 288, 298, 547 S.E.2d 506, 511 (Ct.App.2001) ("The best interests of the child are paramount when adjudicating a TPR case."). Our supreme court recently overruled a long line of cases holding that the termination of parental rights statute should be strictly construed and determined that it should be liberally construed consistent with the purpose of facilitating prompt adoption and the best interests of the child. *See Joiner ex rel. Rivas v. Rivas,* 342 S.C. 102, 536 S.E.2d 372 (2000). Likewise, we consider the child's best interests as a factor here. In *Abernathy,* the supreme court stated that the father's constitutional window is a limited one, balanced against the child's interest in stability. *Aber-*

*nathy* at 32, 437 S.E.2d at 28. The record is clear that both the natural father and the adoptive parents would be fit parents and provide loving homes. However, the evaluating psychologist's testimony is also clear that taking the child out of the home he has known from birth until two years old would result in significant long-term trauma and possibly severe attachment issues. Thus, the best interests of Infant Baby Boy warrant reversal of the family court in this instance.

Due to its finding that Bacon's consent was required, the family court held the adoption by the Arscotts could not proceed. Given that Ford gave her consent to the adoption specifically to the Arscotts, the family court held that Ford could possibly initiate an action seeking to withdraw her consent for adoption. The court therefore declined to terminate her parental rights. No specific issue was raised by the appellants to the court's ruling regarding Ford. However, due to the role of the courts in protecting minors, this court may raise *ex mero motu* issues not raised by the parties. *See Joiner* at 107, 536 S.E.2d at 374. As in *Parag*, because Ford consented to the adoption and defaulted below, the family court erred in not terminating her parental rights. *Parag* at 229, 508 S.E.2d at 594. The record discloses no indication that Ford's consent to adoption of the child by the Arscotts was involuntary. Since we conclude Bacon's consent is not required, there is no reason to vitiate Ford's consent. Rather, it is in the best interests of the minor child to resolve this matter as expeditiously as possible. Therefore, we reverse the family court's decision not to terminate Ford's parental rights. Ford's parental rights are terminated, and the adoption may proceed without Bacon's consent.

*Arscott,* 351 S.C. at 54–56, 567 S.E.2d at 903–04.

## C. Roe's Conduct

■ Initially, it is important to note that section 20–7–1690 is the benchmark for determining whether an unwed father's consent is required before an adoption takes place. This statutory starting point requires that a father pay a "fair and reasonable sum, based on the father's financial ability, for the support of the child or for the expenses incurred in connection

with the mother's pregnancy or with the birth of the child, including, but not limited to, medical, hospital, and nursing expenses." S.C.Code Ann. § 20–7–1690 (Supp.2005). *Abernathy* held that under certain circumstances, total compliance with the literal requirement of the statute might be excused. In *Abernathy,* the court declared:

> an unwed father's ability to cultivate his opportunity interest in his child **can be thwarted** by the refusal of the mother to accept the father's expressions of interest in and commitment to the child. **Accordingly,** we conclude that an unwed father is entitled to constitutional protection not only when he meets the literal requirements of section 20–7–1690(A)(5)(b), but also when he undertakes sufficient prompt and good faith efforts to assume parental responsibility and to comply with the statute.

*Abernathy,* 313 S.C. at 32, 437 S.E.2d at 29 (emphasis added). Thus, *Abernathy's* sufficient prompt and good faith efforts test does not replace the statute, but rather extends the spirit of the statute to an unwed father who is prevented from meeting the statutory requirements, especially when impeded from compliance by the birth mother.

The instant case is readily distinguishable from *Abernathy* and *Queen*—the two cases in which our supreme court has found a father's consent to adoption necessary. Consent cases involve a fact-intensive analysis, and the decisions in both *Abernathy* and *Queen* were predicated upon unusual facts. *Arscott,* 351 S.C. at 48, 567 S.E.2d at 900 ("The importance of analyzing the facts of each specific case cannot be overstated."); *Abernathy,* 313 S.C. at 31, 437 S.E.2d at 29 ("[W]e must ascertain the interaction between the requirements of section 20–7–1690(A)(5)(b) and the unusual facts before us."); *Queen,* 347 S.C. at 10, 552 S.E.2d at 764 ("In our view, under the very limited facts of this case, we find Queen demonstrated sufficient prompt and good faith efforts[.]").

The father in *Abernathy* was faced with military deployment which forced his separation from the mother. He nevertheless sought to provide during the pregnancy by giving the mother full use of his car and bank account. Once the father returned, the mother "rebuffed his advances and rejected his offer of marriage." Contrastively, Roe's contributions to Me-

lanie were too insubstantial to be of consequence. During the last half of Melanie's pregnancy Roe saw her for only fifteen minutes and contributed nothing to her except a pillow. Melanie never rebuffed his advances or otherwise demonstrated a disinterest in having Roe involved and supportive during the pregnancy. Whereas the father in *Abernathy* "timely demonstrated a willingness to develop a full custodial relationship with his child," 313 S.C. at 33, 437 S.E.2d at 29, Roe failed to evince a commitment to the child deserving of protection, *see id.* at 31, 437 S.E.2d at 28 ("The specific acts undertaken by the unwed father to preserve his inchoate relationship with his child, as well as the nature of the relationship he wishes to foster with the child, are of considerable importance in determining whether the unwed father has evinced a commitment to his child deserving of protection.").

*Queen* was a thwarted birth father case. The mother misled the father into believing she had had an abortion and obtained a warrant whereby Queen was ordered to have no contact with her. After learning about the baby, Queen put away money for the child, arranged for the child's medical insurance, and prepared a nursery. Here, Roe maintained contact with Melanie for only the first half of her pregnancy. It was Roe—not Melanie—who ended the contact. Melanie never refused Roe's help, but rather requested it, informing him, "I can't do it by myself." Further, Melanie attempted to reach Roe on several occasions, but he was apparently avoiding her in a surreptitious attempt to mislead her into believing he was divorcing his wife. His contributions to her were de minimis. In *Queen*, the court noted that "Queen's failure to support during the pregnancy was through no fault of his own[.]" In contrast, the blame for Roe's failure to support Melanie during her pregnancy falls squarely on his shoulders.

Prior to August 4, Roe's contributions to Melanie were negligible, consisting of approximately $50, cigarettes, and a few trips to fast food restaurants. After August 4 he gave her nothing but a card and a pillow. Roe's contributions to Melanie were insubstantial and inconsistent. As the *Arscott* court observed, "Most cases focus on pre-placement conduct except where there is no evidence the natural father knew of the birth." 351 S.C. at 54, 567 S.E.2d at 903. Roe simply failed to meet the "general minimum standards by which an

unwed father timely may demonstrate his commitment to the child, and his desire to grasp the opportunity to assume full responsibility for his child." ˙ *Abernathy* 313 S.C. at 32, 437 S.E.2d at 29 (internal quotation marks and citation omitted).

## II. Best–Interests Analysis

■ Roe contends the judge erred by going beyond the scope of the hearing and engaging in a best-interests analysis. The parties stipulated prior to trial that the Does were seeking only adoption and did not have an alternative pleading for custody. Therefore, had Roe's consent been required, Roe would have been granted custody. Given the stipulation, Roe contends the court should not have addressed the child's best interests. We disagree.

The family court's decision was based on Roe's failure to comply with the statute and case law, independent of considerations of the child's best interests. The family court's order stated: "It is clear, and this Court holds, that Mr. Roe failed both the literal language of the statute and failed to exercise his responsibilities pursuant to the Common Law Precedent." The court's legal conclusion stands on its own. Although the best-interests finding was not required, the court did not err in separately considering the child's best interests. As we stated in *Arscott,* "[I]n the ultimate analysis, this court's lodestar is always the best interests of the child." *Arscott,* 351 S.C. at 55, 567 S.E.2d at 903. Therefore, the court's best-interests analysis does not constitute reversible error.

## III. Termination of Roe's Parental Rights

Roe argues that even if section 20–7–1690 and *Abernathy* did not require his consent to the adoption, his parental rights should not have been terminated. He maintains that because his parental rights should not have been terminated, the notice provision of section 20–7–1374 allows him to "fully participate in the adoption proceedings and assert his independent causes of action for custody."

### A. Preservation

■ This argument was not raised in Roe's Rule 59(e) motion, and does not appear to be preserved. An issue cannot be raised for the first time on appeal, but must have been

raised to and ruled upon by the trial judge to be preserved for appellate review. *Lucas v. Rawl Family Ltd. P'ship*, 359 S.C. 505, 598 S.E.2d 712 (2004); *I'On, L.L.C. v. Town of Mt. Pleasant*, 338 S.C. 406, 526 S.E.2d 716 (2000); *Austin v. Specialty Transp. Services, Inc.*, 358 S.C. 298, 594 S.E.2d 867 (Ct.App.2004); *see also Ellie, Inc. v. Miccichi*, 358 S.C. 78, 594 S.E.2d 485 (Ct.App.2004) (noting it is axiomatic than an issue cannot be raised for the first time on appeal). An issue is not preserved where the trial court does not explicitly rule on an argument and the appellant does not make a Rule 59(e) motion to alter or amend the judgment. *Hawkins v. Mullins*, 359 S.C. 497, 597 S.E.2d 897 (Ct.App.2004).

Roe filed a Rule 59(e) motion raising several issues, but the motion did not mention the court's termination of his parental rights. Moreover, at the Rule 59(e) hearing, Roe's counsel acknowledged the court's termination of his parental rights in passing and did not assert that the termination was in error. In asking the court to grant Roe supervised visitation counsel stated: "I know this is getting into a whole new issue here **and the court certainly has ruled that his rights are to be terminated under this order.** But I would ask the court and in reviewing this to address that issue as to whether or not Mr. Roe should be afforded any visitation." (Emphasis added.) Roe never complained to the family court of the termination of his parental rights. Because Roe did not raise this issue in his Rule 59(e) motion, he may not raise it for the first time on appeal.

### B. Merits of the Termination

■ Even were this issue preserved, the family court properly denied Roe's parental rights. The United States Supreme Court case, *Lehr v. Robertson*, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983), elucidated that a biological father has a limited window in which to secure for himself Constitutional protection of the father-child relationship:

When an unwed father demonstrates a full commitment to the responsibilities of parenthood by "com[ing] forward to participate in the rearing of his child," *Caban*, 441 U.S., at 392, 99 S.Ct., at 1768, his interest in personal contact with his child acquires substantial protection under the due process clause. At that point it may be said that he "act[s]

as a father toward his children." *Id.*, at 389, n. 7, 99 S.Ct., at 1766, n. 7. But the mere existence of a biological link does not merit equivalent constitutional protection. . . .

The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a state to listen to his opinion of where the child's best interests lie.

*Lehr,* 463 U.S. at 261–62, 103 S.Ct. 2985 (footnotes omitted).

■ In the case *sub judice,* the family court extended Roe his procedural and substantive due process rights and determined he had failed to demonstrate the level of commitment to the responsibilities of parenthood that would trigger constitutional protection. Roe correctly asserts that, pursuant to S.C.Code Ann. section 20–7–1770 (Supp.2005), biological parents lose their rights over the adoptee after a final decree of adoption is entered. However, nothing in the statute prevents this process from being completed in a bifurcated fashion as the court did here.

The family court adjudicated Roe's claim that his consent was required for adoption. By requesting remand to determine whether adoption by the Does would be in Jay's best interest, Roe is essentially seeking an impermissible second attempt at preventing the adoption. The family court did not err in terminating Roe's parental rights. Further, because his rights were properly terminated, Roe is not entitled to notice of the final adoption proceeding pursuant to S.C.Code Ann. section 20–7–1734(A) (Supp.2005). *See id.* ("Notice of any proceeding initiated pursuant to this Subarticle 7 of Article 11 of Chapter 7 of Title 20 must be given to the persons or agencies specified in subsection (B) of this section, unless the person has given consent or relinquishment **or parental rights have been terminated.**") (emphasis added).

378

*CONCLUSION*

The order of the family court is
**AFFIRMED.**

HEARN, C.J., and GOOLSBY, J., concur.